1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JIMMY LEE BILLS,

11                  Petitioner,

12        vs.                                      No. CIV S-06-2223 MCE GGH P

13   KEN CLARK, et al.,

14                  Respondents.              FINDINGS AND RECOMMENDATIONS

15   _____/

16   Introduction

17              Petitioner, proceeding with appointed counsel, filed a petition pursuant to 28

18   U.S.C. § 2254.  Petitioner was convicted of possession of a sharp instrument by a state prisoner

19   in Sacramento County Superior Court and sentenced in 2002, pursuant to the three-strikes law, to

20   a term of 25 years to life.  Petition, p. 3.  In his original petition, which was filed pro se,

21   petitioner raised the following grounds: 1) trial court error/abuse of discretion in failing to grant

22   petitioner a hearing as to his trial counsel's ineffective assistance of counsel prior to trial; 2) trial

23   court violated petitioner's constitutional rights in permitting petitioner to represent himself when

24   petitioner was forced to that position by court's failure to hear his motion set forth in claim one

25   above; 3) his constitutional rights were violated by his having been shackled throughout the trial

26   without a hearing; 4) trial court abuse of discretion when petitioner's pro per Pitchess motion

was refused and unreviewed due to petitioner's procedural errors.[1]  Petition, pp. 6-20.

Motion to Dismiss

Respondent filed a motion to dismiss on March 27, 2007, to which petitioner, following liberal extensions of time, filed an opposition and request for an evidentiary hearing, on January 17, 2008, after which respondent, also with extensions of time, filed a reply on March 27, 2008.  Petitioner does not dispute that the petition was filed beyond the AEDPA filing deadline.  See Opposition (Opp.), filed on Jan. 17, 2007, p. 2.  At a hearing on May 22, 2008, petitioner's motion for an evidentiary hearing and expansion of the record based on petitioner's claimed entitlement to equitable tolling based on petitioner's alleged serious mental illness and cognitive impairments was granted, and the evidentiary hearing date was set.  See Order, filed on May 27, 2008.  Following the evidentiary hearing on July 15, 2008, wherein Marylou Hillberg represented petitioner and Robert Gezi represented respondent, the parties filed supplemental briefing with respect to the applicable standard for equitable tolling: respondent on July 23, 2008, and petitioner on July 24, 2008.  On July 29, 2008, respondent made a supplemental lodging.

## *Legal Standard*

The statute of limitations for federal habeas corpus petitions is set forth in 28 U.S.C. § 2244(d)(1):

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of–
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

---

[1] There is some disparity in the order in which petitioner sets forth his claims on his petition form as opposed to within his attached memorandum; the court has listed the claims pursuant to the chronology as set forth in the petition form.

1             (C) the date on which the constitutional right asserted was initially
            recognized by the Supreme Court, if the right has been newly
2             recognized by the Supreme Court and made retroactively
            applicable to cases on collateral review; or
3

            (D) the date on which the factual predicate of the claim or claims
4             presented could have been discovered through the exercise of due
            diligence.
5

6         As noted, there is no dispute that petitioner's federal habeas filing was untimely

7 under the AEDPA statute.  Opp., p. 2.  The record demonstrates that petitioner's conviction

8 became final on January 27, 2004, ninety days after the state supreme court denied petitioner's

9 petition for review on direct appeal on October 29, 2003.  Respondent's Lodged Document 5; see

10 Cal. Rules of Court, Rule 8.308(a) (former Rule 31); Bowen v. Roe, 188 F.3d 1157, 1158-59 (9th

11 Cir. 1999) ("holding] that the period of 'direct review' in 28 U.S.C. § 2244(d)(1)(A) includes the

12 [ninety-day] period within which a petitioner can file a petition for a writ of certiorari with the

13 United States Supreme Court, whether or not the petitioner actually files such a petition.")  The

14 statute of limitations began to run the next day, on January 28, 2004.  Patterson v. Stewart, 251

15 F.3d 1243, 1246 (9th Cir. 2001).  Petitioner had one year, that is, until January 27, 2005, to file a

16 timely federal petition, absent applicable tolling.

17         Section 2244(d)(2) provides that the time during which a properly filed

18 application for State post-conviction or other collateral review with respect to the pertinent

19 judgment or claim is pending shall not be counted toward any period of limitation.  On

20 November 15, 2004, under the mailbox rule,[2] petitioner filed one state habeas petition, which

21 was denied on October 12, 2005.  Respondents' Lodged Document 6.  Pace.  At the time of filing

22 his single state court habeas petition, respondent is correct that 291 days of the statute had run,

23 leaving 74 days to run after the October 12, 2005, denial for petitioner to file in federal court, or

24

25     [2] Pursuant to Houston v. Lack, 487 U.S. 266, 275-76, 108 S. Ct. 2379, 2385 (1988), pro
se prisoner filing is dated from the date prisoner delivers it to prison authorities.  Stillman v.
Lamarque, 319 F.3d 1199, 1201 (9th Cir. 2003) (mailbox rule applies to pro se prisoner who
26 delivers habeas petition to prison officials for the court within limitations period).

1   until December 25, 2005 (or the day after in view of the holiday).  However, petitioner did not

2   file the instant petition until October 10, 2006, after a lapse of 362 additional days, and is thus

3   untimely under the statute by 288 days, or, as petitioner concedes, by some nine and one-half

4   months.  The court now considers whether petitioner is entitled to equitable tolling.

5   *Equitable Tolling*

6            The question before the court is whether petitioner is entitled to equitable tolling

7   for any of the periods of time from January 28, 2004, which commenced the running of the

8   AEDPA statute until the filing in this court on October 10, 2006, mindful that the statute was

9   tolled from the filing of the state supreme court petition, on October 12, 2005, until the filing of

10  the instant petition on October 10, 2006.[3]  More narrowly, as equitable tolling is only appropriate

11  during the delay caused by circumstances beyond a petitioner's control, Corjasso v. Ayers, 278

12  F.3d 874, 879 (9th Cir. 2002), the court could construe the precise period at issue to be from on or

13  around December 25, 2005, the point at which the statute had run, until the filing of the instant

14  petition, on October 10, 2006, a nine and a half month period.  Petitioner asserts, through his

15  counsel, that petitioner's mental condition and developmental deficits rendered him unable to

16  timely the instant petition, and hence the limitations period should be tolled.

17  *Applicable Standard*

18          "Generally, a litigant seeking equitable tolling bears the burden of establishing

19  two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary

20  circumstance stood in his way."  Pace v. DiGuglielmo, 544 U.S. 408, 418, 12 S. Ct. 1807, 1814;

21  Miranda v. Castro, 292 F.3d 1063, 1065 (9th Cir. 2002) (a habeas petitioner bears the burden of

22  proving that equitable tolling should apply to avoid dismissal of an untimely petition).

23  _____

24       [3] To the extent that petitioner's counsel states that petitioner is entitled to equitable tolling
     from the date of the denial by the state supreme court of the petition for review, which occurred
25   on October 29, 2003, but after which petitioner was able to file a pro se petition for writ of
     habeas corpus in the state supreme court, on November 15, 2004, subsequently denied on Oct.
26   12, 2005, the court assumes that this is simply an erroneous reference to the state supreme court
     decision at issue.

"Equitable tolling is unavailable in most cases," and is only appropriate "if *extraordinary* circumstances beyond a prisoner's control make it impossible to file a petition on time." Miranda, supra, at 1066 (internal quotations/citations omitted [emphasis added in Miranda]).  A petitioner must reach a "very high" threshold "to trigger equitable tolling [under AEDPA]...lest the exceptions swallow the rule."  Id.  The Ninth Circuit has held that claims of ignorance of the law and illiteracy do not constitute such extraordinary circumstances and are insufficient to justify equitable tolling.  See Raspberry v. Garcia, 448 F.3d 1150, 1154 (9th Cir. 2006); see also Hughes v. Idaho State Bd. Of Corrections, supra, 800 F.2d at 909 (9th Cir. 1986) (pro se prisoner's illiteracy and lack of knowledge of the law unfortunate but insufficient to establish cause).

On the other hand, there is no doubt that a sufficiently severe mental or physical handicap could render a timely filing not possible.   Laws v. Lamarque, 351 F.3d 919 (9th Cir. 2003).  In Laws, the Ninth Circuit noted again that equitable tolling is available in this circuit only "'when extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time' and 'the extraordinary circumstances were the cause of his untimeliness.'" Laws, supra, at 922, citing Spitsyn v. Moore, 345 F.3d 796, 799 (9th Cir. 2003).  The Laws Court, id., also noted that grounds for equitable tolling under § 2244 (d) are "highly fact-dependent," quoting Whalem/Hunt v. Early, 233 F.3d 1146, 1148 (9th Cir. 2000).  The Ninth Circuit held that it was an abuse of discretion for the district court to deny Laws's petition, where he claimed he was mentally ill between April 23, 1996 (the date of AEDPA's enactment) and May 16, 2000, when his first state habeas petition was filed and entitled to equitable tolling, without the court's having ordered development of the factual record supporting the claim.  Id., at 922-23.  The case also makes clear that the Ninth Circuit observed that it had previously "held that a 'putative habeas petitioner's mental incompetency [is] a condition that is, obviously, an extraordinary circumstance beyond the prisoner's control,' so 'mental incompetency justifies equitable tolling' of the AEDPA statute of limitations."  Laws, supra at 923, citing Calderon v. United States

1   District Court (Kelly), 163 F.3d 530, 541 (9th Cir.1998)(en banc).[4]  In doing so, the Ninth Circuit

2   in that case noted, as a backdrop, that the trial court had expressed its concern about Laws's

3   competency and had ordered psychiatric examinations and a hearing under Cal. Penal Code §

4   1368, and had found, in the face of conflicting expert testimony that Laws was "'for the present

5   at least'" competent to stand trial.  Laws, supra, at 921.  Although ultimately determined to be

6   competent, petitioner's competency herein was evidently enough at issue for the trial court to

7   direct competency evaluations pursuant to Cal. Penal Code § 1367 (see below).  Nevertheless,

8   the Laws Court stated that the determination of competency at the time of trial (despite the

9   evidence of serious mental illness) did not bear on the competency of Laws for the period of time

10  at issue for which no medical records had been provided.  It is petitioner's burden to demonstrate

11  that his condition was so deficient or in such a state of deterioration as to constitute an

12  extraordinary circumstance such that his time for filing should be equitably tolled.  He must

13  make a showing that his mental incompetence was such that he could not have met the standard

14  for competency to proceed with trial.  Dusky v. U.S., 362 U.S. 402, 80 S. Ct. 788 (1960) (the

15  "test must be whether he has sufficient present ability to consult with his lawyer with a

16  reasonable degree of rational understanding-and whether he has a rational as well as factual

17  understanding of the proceedings against him").  Adapting that to the habeas context would

18  require that petitioner must demonstrate that at the times for which he seeks equitable tolling, he

19  did not have a reasonable degree of rational understanding and that he suffered from a lack of

20  such understanding with regard to what was required of him in the filing of his petitions; in doing

21  so, he must be able to explain, how, in light of his efforts, for example, to take certain steps to

22  proceed exhaust his claims in state court, such steps do not fatally undermine his claim of mental

23  incapacity.

24  \\\\\

25  ───────────────────

26      [4] Overruled on another ground by Woodford v. Garceau, 123 S. Ct. 1398, 538 U.S. 202 (2003).

1     Any lesser standard than incompetence does not equate to the "'impossible to file

2  a petition'" language in Laws.  The Ninth Circuit itself spoke of mental illness and *incompetence*

3  to timely file in the same breath.  "For that purpose, it is pertinent that a *pro se* inmate's actual

4  mental incompetence may be at least as much of an external bar to his meeting AEDPA's strict

5  deadlines...."  Laws, 351 F.3d at 923.  Secondly, any lesser standard would be impossible to

6  quantify.  "More difficult" to timely file is standardless.  Further, what would it mean in terms of

7  timely filing if one was "substantially impaired" in the context of timely filing a petition?

8  Essentially, it would mean anything to anyone.  Any general, depressive atmosphere in a prison

9  setting which affects a prisoner could conceivably qualify.

10     Moreover, the question of incompetence to timely file encompasses more than just

11  the inability to draft and file a pro se petition.  It is a fact of prison life, and one borne out by the

12  facts in this case, that prisoners often do not draft their own pleadings.  This may be so because

13  of language problems, illiteracy, low mental functioning, and the like, and, as noted above,

14  illiteracy in and of itself of course does not warrant equitable tolling, nor does ignorance of the

15  law.  Rather, it is common that a person with legal experience, aka jailhouse lawyer, takes over

16  the drafting of pleadings for a fee or for free.  A competence standard which fails to take into

17  account this reality is artificial and arbitrary.  Thus, any incompetence standard must be tailored

18  to the ability to request or utilize available assistance, not just the ability to draft a petition.  In

19  other words, the critical inquiry is whether the prisoner can understand that the filing of a petition

20  is necessary, and can take some steps to make that happen.  If a non-English speaker's ability to

21  acquire assistance from other inmates will preclude equitable tolling, and it does, Mendoza v.

22  Carey, 449 F.3d 1065, 1070 (9th Cir. 2006), a prisoner who is mentally impaired but who is able

23  to acquire legal assistance will be similarly precluded.

24     Petitioner in supplemental briefing noted that a habeas petitioner in a capital case

25  is entitled to habeas counsel and that the standard for competency is based on whether or not a

26  petitioner can rationally communicate with his counsel.  Ptn. Supp. Brf., p. 3, citing Rohan ex

rel. Gates v. Woodford, 334 F.3d 803, 813 (9th Cir. 2003).  Acknowledging that a non-capital habeas petitioner does not have the same right to counsel, petitioner contends that the same standard should apply and turn on whether or not petitioner can communicate rationally with the court.  Of course, application of Rohan in the non-capital setting would present a Catch 22 to the individual who claims incompetence in the underlying proceedings since if a capital habeas petitioner is, or becomes, incompetent during the course of habeas proceedings, the case must be stayed until competency returns.  The "delay" stakes in a capital habeas case are precisely opposite the stakes in a non-capital habeas.  In a capital case, delay ordinarily favors the petitioner; in the non-capital setting, delay will inure to the detriment of the person bringing the petition.  That is, petitioner would never get to prove his allegations in federal habeas because he would be prevented from proving them on account of his present incompetence.  Even where there is not an underlying claim of incompetence at trial, it is difficult to believe that a petitioner would want to file a federal habeas to get his conviction overturned and at the same time desire to have his federal habeas stayed.  Logic limits Rohan to capital cases and the undersigned is unaware of its application outside of that context.

In Indiana v. Edwards, 554 U.S. __, 128 S. Ct. 2379, 2388 (2008), the Supreme Court recently concluded that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under Dusky but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves."  The Edwards Court, as petitioner points out, made a distinction between the level of competency required for a defendant to proceed with the assistance of counsel and to proceed pro per.  Ptn. Supp. Brf., p. 7.  In determining the inefficacy of a single standard to decide mental competency of a defendant to proceed to trial with counsel and to decide whether a defendant must be allowed to represent himself at trial, the Court observed:

> Mental illness itself is not a unitary concept. It varies in degree. It
> can vary over time. It interferes with an individual's functioning at
> different times in different ways... In certain instances an

> individual may well be able to satisfy <u>Dusky</u>'s mental competence
> standard, for he will be able to work with counsel at trial, yet at the
> same time he may be unable to carry out the basic tasks needed to
> present his own defense without the help of counsel.

128 S. Ct. at 2386.

Petitioner's counsel argues that petitioner falls in the chasm between being one competent to proceed to trial but not competent to proceed to trial without counsel.  However, the cite to <u>Indiana v. Edwards</u> is inapposite.  The Supreme Court did not hold that one has a Constitutional right not to proceed *pro se* if he has mental problems, but only that the previously inflexible <u>Faretta</u> rule requiring courts to allow a defendant to represent himself if he was "competent" should be relaxed somewhat.  The case is inapposite to the issue of when someone is competent to understand that filing a habeas petition is necessary and has to be done sooner rather than later.   <u>Indiana v. Edwards</u> does not dilute the competency standard.

Thus, the standard petitioner must show to obtain equitable tolling is one of incompetence to timely file.  Petitioner here must show that he was unable by reason of mental defect to understand his need to timely file a habeas petition and unable to take steps to effectuate that filing.  Included within this showing would be a demonstration that during the pertinent period, he was unable to ask for available assistance in filing the habeas.

### *Evidentiary Hearing & Discussion*

Petitioner bases his claim for equitable tolling on the premise that he lacked reasonable access to the courts under the Americans with Disabilities Act, contending that he is unable to read and write, suffers from neurological deficits, has a borderline to mildly retarded level of intelligence and a concurrent psychosis, and because assistance was not available to him. See Opposition.

In testing and evaluation, two psychologists have found that petitioner has a below average intellectual capacity with very limited verbal skills, reading at a second grade level, as well as difficulty with math.  Opp., Ex. B, Shawn Johnston, Ph.D., letter dated 12/03/01; Ex. E,

1   Declaration of John S. Miller, Ph.D (petitioner's expert).  A third psychologist found that

2   petitioner's language usage and content was in the range of low average to borderline.  Opp., Ex.

3   B, Letter of John Alan Foster, Ph.D., dated 11/30/01.[5]  Dr. Foster states that petitioner was able

4   to count backwards and do simple math calculations (addition/subtraction), although petitioner

5   would or could neither count forward nor backward for Dr. Johnston.  Both Drs. Johnston and

6   Foster found petitioner oriented to person, place and time.  Dr. Johnston found petitioner

7   possessed some abstract thinking capacity when he was able to interpret two simple proverbs, but

8   Dr. Foster found petitioner had difficulty in explaining the meaning of proverbs.  To Dr.

9   Johnston petitioner denied he was physically abused by his mother and her boyfriends, but

10  petitioner told Dr. Miller that he and his siblings had been subjected to beatings as children.  Dr.

11  Johnston found, at the time of his evaluation, that the petitioner was suffering "from a crack

12  cocaine dependency disorder, an underlying antisocial personality disorder, and a possible

13  schizophrenic disorder," noting that petitioner told him that he heard voices, even though he was

14  receiving psychiatric medication at that time.  Opp., Ex. B, p. 4.  There appeared to be some

15  question for Dr. Johnston as to the genuineness of the auditory hallucinations to which petitioner

16  attested (which hallucinations he also reported to Dr. Foster and which Dr. Foster noted were

17  included as reported symptoms in his prison medical record), but even assuming that petitioner

18  was experiencing such hallucinations, Dr. Johnston nevertheless found petitioner to be competent

19  to proceed to trial, concluding, after determining, inter alia, that petitioner understood the roles of

20  _____

21        [5]  Both Drs. Johnston and Foster in late 2001, performed competency evaluations,
    pursuant to Cal. Penal Code § 1367, for the purpose of determining whether petitioner was
22  competent to stand trial at or around that time.  *The undersigned emphasizes that he understands
    that petitioner's competency to file a habeas petition is not necessarily decided by his
23  competency at a previous time*; however, evidence of competency a relatively short time prior to
    the period in question may well be relevant to competency during the time period in question.
24  The degree of relevancy is determined on the nature of the alleged mental deficiencies, and their
    ability to wax and wane.  For example, a drug induced mental retardation may improve
25  somewhat when the drugs are removed from the environment; a congenital mental retardation is
    not likely to improve.  In either case, the evidence adduced in the prior period concerning the
26  cause of mental deficiencies would be relevant – one discounting petitioner's arguments here and
    one supporting those arguments.

the "various judicial actors," that: "even though this defendant undoubtedly has a plethora of significant psychological problems, he most definitely appears to understand the nature of the charges and proceedings against him and is capable of working with his attorney in preparing a rational defense in his case. He is competent." Id., at 4-5. While at the evidentiary hearing, petitioner's expert, Dr. Miller, pronounced petitioner to be "severely disabled," he expressly did not dispute Dr. Johnston's report and findings, although he questioned some of Dr. Foster's evaluation. See Evidentiary Hearing.

Dr. Foster noted in his 2001 letter that prison medical indicated that he had been treated for "a bipolar condition and psychotic disorder due to head trauma/alcohol dependence" and was prescribed Divalproex and Risperidone by a psychiatrist. Opp., Ex. B. Dr. Foster noted that the medical records also indicated that petitioner was in the CCCMS[6] program, was regularly seen by psychiatric staff, but was not participating in treatment groups. Petitioner evidently also told Dr. Foster that he had received a head injury in a vehicle accident at nineteen or twenty years of age, and that he had used alcohol, marijuana and cocaine for many years from his early youth. Dr. Miller reports that petitioner told him he had used alcohol since he was a kid, but was not able to say at what age he began, while Dr. Foster reported that petitioner told him that he began drinking at age ten. Opp. Ex. B, Ex. E., p. 5.[7] Dr. Miller reported that petitioner informed him that he had had numerous alcohol related blackouts; had used cocaine since the mid-eighties until his present incarceration and also had smoked it; and used methamphetamines even while in prison; had once tried heroin; and had taken many pills, including Valium and Qualudes. Opp., Ex. E, p. 5.

There is some confusion as to petitioner's educational background: Dr. Johnston reported that petitioner said he graduated from high school in the California Youth Authority

---

[6] Correctional Clinical Case Management Services.

[7] The court's electronic docketing pagination is referenced.

1   (CYA) in 1988, and Dr. Miller also reports that his highest level of education was his CYA high

2   school graduation, while Dr. Foster states that petitioner attended both public high school and

3   school in CYA, but told him he graduated, June of 1988, from Castlemont High School, after

4   which he completed one unidentified class at Los Modanos College.  Opp., Ex. B; Ex. E, p. 5.

5   Dr. Miller adds that petitioner told him that he attended special education classes throughout his

6   education, but petitioner was apparently unable to submit records to clarify his educational

7   background, an omission respondent has noted.

8           Dr. Miller rendered his evaluation of petitioner's mental/intellectual capabilities

9   and limitations after meeting with him and giving him tests more recently and, evidently, for a

10  significantly more extended period of time than Drs. Johnston and Foster.  See Evidentiary

11  Hearing & Opp., Ex. E.  Dr. Miller testified to spending 9-10 hours on each of two days with

12  petitioner for the purpose of evaluating petitioner's cognitive capabilities, limits and disabilities,

13  on November 15-16, 2007.  Id.  Whereas petitioner evidently did not report visual hallucinations

14  in the earlier assessments referenced above, to Dr. Miller he reported both auditory and visual

15  hallucinations.  Opp., Ex. E, p. 3.  Dr. Miller found petitioner oriented to person, place and

16  situation but not well-oriented to time as to the day of the week and month.  Petitioner was

17  unable to subtract serially 7s or 3s and unable to spell "world" backwards or forwards.  Petitioner

18  reported to Dr. Miller that his mother had died in 1999 and also told him, in contrast to what he

19  had reported to Dr. Johnston, that he and his siblings "used to get beat up all the time."  Id. at 4.

20          In petitioner's medical history, in addition to noting petitioner's head trauma in

21  his twenties from a motor vehicle accident, Dr. Miller also reports petitioner's psychiatric/mental

22  health history from prison medical records dating back to 1997.  In August of 1997, petitioner

23  was evaluated as having perceptions "positive for auditory hallucinations," having "persecutory

24  delusions" and poor judgment and insight.  The "diagnostic impression offered" referenced

25  "Psychotic Disorder NOS and Antisocial Personality Disorder" with a global assessment function

26  (GAF) score of 55.  Petitioner was found to be appropriate to receive the CCCMS level of care.

1   Opp., Ex. E, p. 7.  It was nevertheless noted that while his speech was observed to be rapid at

2   times "his appearance, behavior, mood, intellectual functioning, and speech were all considered

3   to be within normal limits...."   Id.  On October 20, 1997, the mental health evaluation noted

4   petitioner's admission to a psychiatric hospital in 1990 and 1993 (this contrasts with a mental

5   health evaluation conducted on June 19, 2003, wherein petitioner was noted to have had no

6   history of admission to a psychiatric hospital), found his perceptions to be positive for both

7   visual and auditory hallucinations, noted a history of substance abuse and mental health

8   problems.  Opp., Ex. E, pp. 7, 9.  Petitioner attributed the inception of his hallucinations to his

9   use of cocaine.  The diagnostic impression was that petitioner had Substance Induced Psychotic

10   Disorder, this time with a GAF of 60.  Petitioner was prescribed Mellaril.  Id.  Again during that

11   evaluation, "his appearance, behavior, mood, intellectual functioning, and speech were all

12   considered to be within normal limits."  Id.

13          In August of 1999, in being assessed for a mental health treatment plan, according

14   to Dr. Miller, petitioner's mental health records noted petitioner to have speech difficulties

15   (pressured) and to be in an irritable mood; nevertheless, "his appearance, behavior, intellectual

16   functioning, perceptions, thought content, sensorium, insight and judgment were all considered

17   to be within normal limits"; the diagnostic impression was of Psychotic Disorder and Antisocial

18   Personality Disorder, with a GAF of 60.  Id., at 7-8.

19          In September of 2000, while his appearance, behavior, mood, intellectual

20   functioning, thought content and sensorium were considered within normal limits, he was noted

21   to have "mildly impaired" speech attributable to "racing thoughts," sleep patterns outside normal

22   limits, and poor insight and judgment.  The diagnostic impression this time was of Bipolar

23   Disorder with Hypomania and Psychotic Features and Antisocial Personality Disorder with a

24   GAF of 55.

25          On June 19, 2001, according to Dr. Miller, petitioner's mental health records

26   again showed petitioner had, inter alia, racing thoughts which mildly impaired his speech,

problems sleeping with poor insight and judgment.  The diagnosis was "Bipolar Disorder Manic Moderate, deferred on Axis II and a GAF of 55."  Opp., Ex. E, p. 8.  His November 16, 2001, evaluation in administrative segregation (ad seg) showed him to have a "'stressed out'" mood, but with "appearance, behavior, intellectual functioning, thought content, sensorium, insight and judgment within normal limits."  Id.  He was prescribed Depakote and Risperdal, diagnosed with "Bipolar Disorder Manic Moderate by History, deferred on Axis II and a GAF of 60."  Id.

A February, 2002, evaluation found petitioner to be having sleeping problems, to again be within normal limits as to appearance, mood, behavior, intellectual functioning, perceptions, insight and judgment, etc., still diagnosed as having Bipolar Disorder but with a GAF of 60.  Id., at 8-9.  In an April, 2002, evaluation, petitioner was found to be in an irritable mood, complaining of stress arising from a court case and "noted to be grandiose and entitled with poor insight and judgment."  While the diagnostic impression noted Bipolar Disorder, the GAF fell to 45.  Id., at 9.

A June 19, 2003, evaluation found petitioner to have sleep problems and elevated mood, presenting with Bipolar and Antisocial Personality Disorders with a GAF that rose to 62.  His appearance, behavior, intellectual functioning, speech, etc., were again within normal limits.  He was prescribed Seroquel and Depakote.  Id.  On November 14, 2003, petitioner was agitated and angry, with inappropriate affect, sleep outside normal limits, with "over focused, obsessive and tangential" intellectual functioning.  He had a similar diagnosis as previously set forth, GAF of 60, with medication continued.  Id., at 9-10.  In October of 2004, according to Dr. Miller's reading of the petitioner's mental health records, petitioner was depressed, reported hearing voices, agitated, was continued on meds, with a diagnostic impression of "Bipolar Disorder NOS, Schizophrenia Undifferentiated Type, Antisocial Personality Disorder, a history of femur problems, and a GAF of 58."  Id., at 10.  In October of 2005, a similar working diagnosis was given (this time with a GAF of 63), petitioner having presented with an agitated affect, poor insight and judgment, tangential speech.  Once again on September 14, 2006, the same diagnosis

applied, and petitioner had a GAF of 65.  He was agitated and hyperverbal, but presented with

appearance, intellectual functioning, perceptions, thought content, insight and judgment, etc.

within normal limits. Id., at 10.  On March 14, 2007, petitioner presented as agitated and angry,

his sleep reportedly limited to four to six hours, reporting auditory hallucinations "since 1997,"

showing poor insight and judgment.  The diagnostic impression was "Bipolar Disorder NOS,

Schizophrenia Undifferentiated Type, Antisocial Personality Disorder, a history of femur

problems, and a GAF of 55."  On May 18, 2007, petitioner, who appeared angry, was having

sleep difficulties and claimed to be hearing voices which he did not want to talk about.  The

diagnosis was "rule out Depressive Disorder NOS, Antisocial Personality Disorder, and a GAF

of 62.  Medication and CCCMS treatment were continued."   On November 7, 2007, petitioner

was in an irritable mood and "given working diagnosis of Bipolar Disorder NOS, Antisocial

Personality Disorder, a history of femur problems, and a GAF of 55."  Id. at 11.

       In the battery of tests conducted on petitioner by petitioner's expert, Dr. Miller,

petitioner tested in the "extremely low" range on Wechsler Adult Intelligence Scale, Third

Edition (WAIS-III), that is, in the first percentile relative to his age group in verbal cognitive

functioning, with a score of 64 on Verbal IQ, 67 on Verbal Comprehension and 61 on Working

Memory.  Opp., pp. 11-12.  Dr. Miller found petitioner to show relative strength in common-

sense reasoning; working memory (notwithstanding the low score at which he assesses petitioner

immediately preceding on this facet); attention; sequencing ability; alertness to visual detail, fluid

reasoning using visual stimuli. Id., at 12.  Petitioner was relatively weak on simple calculations

without pencil and paper.  Dr. Miller emphasizes petitioner's limited verbal comprehension and

ability. Id., at 12-13.  On the Wechsler Memory Scale, Third Edition (WMS-III), according to

Dr. Miller's testing, petitioner's general memory functioning showed in the low average range,

with his ability to recall newly learned information in the borderline range.  Id., at 13-14.  Dr.

Miller found that petitioner did not show retention difficulties for auditory memory, nor were

retention difficulties for visual memory significant, but ranked his overall delayed memory

abilities in the low average range.  Id., at 15.  Dr. Miller found that, peculiarly, petitioner was better able to recall information initially given verbally without auditory cues (top of low average range) than with cues (bottom of low average range).  Id.  In the test of nonverbal intelligence, Third Edition (TONI-3), considered a fairer test of intellectual ability for ethnic minorities and the handicapped with a focus on problem-solving and abstract reasoning, petitioner showed a low average range of nonverbal intelligence with an IQ of 85 placing him at better than 16% of the population in nonverbal intelligence.  Other tests administered by Dr. Miller showed petitioner to have an overall intellectual ability in the low average range, with his oral language skills within normal limits for those at his age level, and with low basic reading skills.  Opp., Ex. E, pp. 16-18.  Further tests administered by Dr. Miller suggested that petitioner "has difficulty with the fundamental verbal skill of letter sequencing."  Id., at 19.  Petitioner showed some problem-solving ability, but testing showed limitations in the ability to discern "broad, connecting sorting principles" and his particular vulnerability to distractibility.  Id., at 22.  Petitioner was most vulnerable "in letter fluency and sequencing, cognitive flexibility, divided attention, naming speed, initiation of verbal responses and perseverative[8] tendencies."   Id., at 23.  Petitioner does find tasks involving motor speed, visual scanning and number sequencing "relatively easier." Id., at 24.  Varying testing suggested petitioner "has substantial difficulties with attention and hyperactivity"; "an impaired ability for abstract concept formation"; inadaptability; overall, "significant neurological deficits."   Id., at 25-26.  The Wide Range Achievement Test, Revision 3 (WRAT-3) showed petitioner to be reading and spelling at the second grade level and doing arithmetic at the first grade level.  Id., at 26-27.  The Nelson-Denny Reading Test showed that petitioner had "substantial difficulties in reading."  Id., at 27-28.  Dr. Miller found petitioner's responses on the Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2), to be

---

[8] Dr. Miller describes petitioner's perseverating test responses as "meaning they are 'stuck' on fixed ideas,"  indicating "possible impairment in initiation of tasks and concept formation skills."  Opp, Ex. E, p. 34.

uninterpretable due to petitioner having "an unrealistically negative level of personality functioning." Id., at 28. The Million Clinical Multiaxial Inventory, Third Edition (MCMI-III) suggested that petitioner evidenced "either great turmoil, had a tendency to complain, or that he may have an inclination to magnify his difficulties," noting "his tendency to exaggerate or complain," and his inclination, inter alia, to self-sabotage and feeling victimized. Id., at 28-29. Dr. Miller suggested the following plethora of possible diagnoses for petitioner: "Schizophrenia Paranoid type, Posttraumatic Stress Disorder, Adjustment Disorder with Anxiety, Depressive Personality Disorder, Passive-Aggressive Personality Disorder, or Borderline Personality Disorder with Sadistic Personality Traits." Id., at 29.

        In sum, Dr. Miller attributes petitioner's low functioning level to "intrauterine, environmental, learned and acquired deficits," noting that various test scores showed petitioner "demonstrated a Reading Disorder and Expressive Language Disorder that coexists with a Borderline IQ." Id., at 32. Dr. Miller testified to petitioner having under Axis I (of his DSM IV Diagnosis), a Schixoaffective Disorder; under Axis II, an Antisocial Personality Disorder; under Axis III, Traumatic Brain Injury & Injury to Femur; within Axis IV, Psychosocial Stressors: incarceration, Axis V, GAF of 40. See Evidentiary Hearing; Opp, Ex. E at 33. Dr. Miller avers that petitioner's neurological deficits as discerned through his testing demonstrate that petitioner could not understand the habeas form and written directions without assistance, that petitioner even lacks the ability to put words in alphabetical order. Id., at 34-35; Evidentiary Hearing.

        Respondent's Ex. A contain copies of various handwritten motions signed by petitioner related to his trial, including, inter alia, a subpoena for a trial witness, a motion to have his case sent back to the CDC, and 995 motions. When asked during cross-examination at the evidentiary hearing about his authorship of these documents filed pro se at his trial, petitioner conceded that it was written in his handwriting, but that he copied it from an unnamed "neighbor"; as to one motion, declaring that he had "copied every last page off another person's handwriting." Respondent's Ex. B includes several work supervisor reports: the latest is dated

9/29/05, showing that his CDC work supervisor wished to retain him in his job as a line server in the central kitchen; an earlier report is dated 11/01/04, regarding petitioner's kitchen job as a hand packager, wherein petitioner is described as one who "works hard and is a co-operative worker" and is accorded a pay increase; finally, two copies of a report, dated 8/01/04, both marking petitioner for the same pay increase for his packager job, and in one version, bearing the notation that petitioner "has a good attitude and is a hard worker."   Respondent's Ex. C contains, inter alia, a copy of a 602 appeal, dated 4-11-01, complaining about R.N. Ventefenille's alleged failure to provide him appropriate medical care for a gash on his forehead petitioner received falling out of his bunk, an allegation which gave rise to the copy of the civil rights action exhibited as respondent's Ex. D.  Petitioner testified in the hearing that he had copied the words of the complaint.   When asked to turn to Ex. E by respondent's counsel, petitioner asked, "Is that the one after D?"  As to the September 22, 2003, petition for review contained therein, which appears to also include a one-page handwritten insert, petitioner testified that "Troy" had typed petition in three days, petitioner had signed it after Troy read it to him and that Troy went with him to the law library to get it sent off.  Respondent's Ex. I is a copy of petitioner's 2000 pro se federal petition filed in the Northern District on his conviction, pursuant to Cal. Penal Code § 288,[9] not at issue in this case.  The document contains a typewritten and handwritten portion. Petitioner testified that he did not type the document but conceded that he had done the handwriting, protesting that the handwritten portion indicates he did not know what he was doing.  He indicated that he signed it and gave it to prison officials to mail.  Petitioner submitted as Ex. C to his opposition a declaration from an inmate named Troy Anthony Rhodes, signed on March 3, 2007, stating that petitioner had approached him at some unspecified time "with a request to assist him in putting together a petition for habeas corpus relief with the state and federal courts I willing [sic] accepted the task."   In his declaration, Inmate Rhodes declares that

---

[9] Cal. Penal Code § 288 sets forth the punishment/sentencing range for a person convicted of committing lewd/lascivious acts upon on a child under 14.

petitioner could barely read his own trial transcripts and states his serious doubts as to

petitioner's ability to file his own habeas petition unaided in a timely manner.   In his testimony,

petitioner estimated, vaguely, that he provided Troy with the transcripts maybe in 2004, and

referenced unspecified lengthy lockdowns at Corcoran; he was unable to clarify how or if Troy

was paid for his work.

In supplementally lodged documents, respondent submitted transcripts of

petitioner's trial, wherein petitioner represented himself.  The court has reviewed petitioner's

closing argument (respondent noted that petitioner, in addition to filing motions pro se, also

called witnesses, and addressed the jury in an opening statement and closing argument).  While

petitioner shows his "perseverating" tendencies in his summation and much of his argument may

be misdirected, he shows an ability to comprehend and articulate that indicates he has followed

the trial and understands what is at issue.   See Suppl. Lodged Item No.1, RT, 1169-1195.

In addition, when petitioner was on the stand at the hearing, petitioner on occasion appeared to

undermine his own credibility in his effort to convince the court of his deficiencies.  For

example, although records indicate that petitioner has in the past been able to convey his

birthdate without confusion, see Opp., Ex. B, wherein both Drs. Johnston and Foster recorded

petitioner's birthday as October 7, 1969, with Dr. Johnston expressly stating that petitioner had

told him his birthdate, on re-direct at the hearing, petitioner sounded confused and was only able

finally to articulate his birthday as being "October sixty-something."  The professed confusion as

to whether E followed D in respondent's exhibits also did not ring true.  Also, petitioner grew

quite impassioned at the end of the hearing (when he was off the stand), when respondent's

counsel pointed out the disparities in petitioner's denial in the record of physical abuse, later

claiming to have been beaten as a child by his mother and others.  Petitioner declared, essentially,

that he had refused to acknowledge the physical abuse before his mother died because he did not

wish to implicate her criminally or otherwise.  However, as respondent noted, petitioner was

denying the physical abuse (see Dr. Johnston's report) in 2001, even though his mother had

1   apparently died in 1999.   Although Dr. Miller did not attribute his own findings of petitioner's

2   tendency to exaggerate to malingering on petitioner's part, and even though it is plain in the

3   record not only of petitioner's mental health history and Dr. Miller's extensive testing that

4   petitioner suffers from neurological deficits that may have had their beginning before his birth

5   (i.e., in utero) and he may be significantly impaired also as a result of various trauma he

6   experienced as well as further victimized by putative caregivers, petitioner simply does not meet

7   his burden to show entitlement to equitable tolling.   Petitioner apparently relied on another

8   inmate to file his pro se federal petition, and according to that inmate's declaration submitted by

9   petitioner's counsel, had the wherewithal to ask for help in filing his state and federal habeas

10  petitions, certainly before November 15, 2004, when his pro se state supreme court petition was

11  filed, while time still remained on the clock.   Dr. Miller's own recounting of petitioner's mental

12  health history in his prison medical history shows that in October 2004, petitioner was angry and

13  depressed and hearing voices (not a diagnosis that varied widely from several other evaluations),

14  yet still he was evidently able to file the November 15, 2004, state supreme court habeas petition.

15  As to Inmate Rhodes' involvement, petitioner's counsel, as respondent noted, could have

16  produced this witness to provide more clarification as to the extent of petitioner's reliance on this

17  inmate which apparently occurred before the statute of limitations had run.   On the other hand,

18  assuming petitioner totally relied on Rhodes, this court would not extend the ruling of Spitsyn v.

19  Moore, supra, 345 F.3d at 800-802, to encompass assistance from other inmates.   In sum the

20  evidence shows that petitioner has serious mental deficiencies, which would make it difficult for

21  him to file winning habeas pleadings, the evidence also shows that he is able to function on a

22  day-to-day basis, understood the need to challenge his conviction if he desired to be out of

23  prison, and could acquire assistance to do such.   Simply because he acted tardily in doing so for a

24  variety of reasons does not warrant equitable tolling.

25          Accordingly, IT IS HEREBY RECOMMENDED that respondent's motion to

26  dismiss, filed on March 27, 2007, be granted and this case be dismissed.

1    These findings and recommendations are submitted to the United States District

2   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **ten days**

3   after being served with these findings and recommendations, any party may file written

4   objections with the court and serve a copy on all parties.  Such a document should be captioned

5   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6   shall be served and filed within ten days after service of the objections.  The parties are advised

7   that failure to file objections within the specified time may waive the right to appeal the District

8   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9   DATED: 09/17/08

                                                    /s/ Gregory G. Hollows

                                        _____

                                            GREGORY G. HOLLOWS
                                            UNITED STATES MAGISTRATE JUDGE
GGH:009
bill2223.mtd

21