1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                  FOR THE EASTERN DISTRICT OF CALIFORNIA

9    JIMMY LEE BILLS,

10                   Petitioner,

11        vs.                              No. 2:06-cv-2223 MCE GGH P

12   KEN CLARK, et al.,                    ORDER &

13                   Respondents.          FINDINGS AND RECOMMENDATIONS

14   _____/

15   Introduction

16              Petitioner, while serving a state prison sentence on other charges, was convicted

17   of possession of a sharp instrument by a state prisoner in Sacramento County Superior Court and

18   sentenced in 2002, pursuant to the three-strikes law, to a term of 25 years to life.  Petitioner

19   raised, under 28 U.S.C. § 2254 in his original pro se petition, primarily trial court error claims,

20   which he filed in this court on October 10, 2006.[1][2] There is no dispute that petitioner's federal

---

[1] Petitioner's grounds include: 1) trial court error/abuse of discretion in failing to grant petitioner a hearing as to his trial counsel's ineffective assistance of counsel prior to trial; 2) trial court violated petitioner's constitutional rights in permitting petitioner to represent himself when petitioner was forced to that position by court's failure to hear his motion set forth in claim one above; 3) his constitutional rights were violated by his having been shackled throughout the trial without a hearing; 4) trial court abuse of discretion when petitioner's pro per Pitchess motion was refused and unreviewed due to petitioner's procedural errors.  Petition, pp. 6-20.

[2] In light of his lengthy sentence, counsel was appointed for petitioner by order filed on December 18, 2006.  See docket # 6.

1

habeas filing is untimely under the AEDPA statute of limitations.  Docket # 24, p.2.  The record demonstrates that petitioner's conviction became final on January 27, 2004, ninety days after the state supreme court denied petitioner's petition for review on direct appeal on October 29, 2003, the statute of limitations began to run the next day, on January 28, 2004, and petitioner had one year, until January 27, 2005, to file a timely federal petition, absent applicable tolling.  Petitioner filed one state habeas petition on November 15, 2004, which was denied on October 12, 2005.  At the time of filing his single state court habeas petition, 291 days of the statute had run, leaving 74 days to run after the October 12, 2005, denial for petitioner to file in federal court, or until December 25, 2005 (or the day after in view of the holiday).  However, as noted, petitioner did not file the instant petition until October 10, 2006, after a lapse of 362 additional days, making it untimely under the statute by 288 days, or, as petitioner concedes, by some nine and one-half months.  See Docket # 44, pp. 3-4.

On respondent's motion to dismiss the instant habeas corpus petition as barred by the AEDPA one-year statute of limitations, this court held an evidentiary hearing on July 16, 2008, to determine whether petitioner was entitled to equitable tolling due to mental deficiencies during the limitations period.  The undersigned, in a detailed analysis which followed the initial evidentiary hearing on the question, determined that petitioner had not met his burden to show entitlement to equitable tolling for the belated filing of his federal habeas petition based on his mental deficiencies.  When the petition was dismissed on the ground that petitioner had not demonstrated that his mental deficiencies amounted to an extraordinary circumstance rendering him incapable of filing a timely petition, petitioner appealed and the Ninth Circuit reversed and remanded the case, tasking this court with applying a newly articulated two-part test to determine eligibility for equitable tolling based on mental impairment.  See Bills v. Clark, 628 F.3d 1092, 1099-1100 (9th Cir. 2010).

Following the remand, a second evidentiary hearing, to obtain supplemental information was held on the question of equitable tolling for petitioner, was held in this case on

1    April 18, 2012, wherein petitioner remained represented by his appointed counsel, Marylou

2    Hillberg, and Robert Gezi again appeared on behalf of respondent.  In the published decision

3    decision, underline supra, a Ninth Circuit panel set forth that "eligibility for equitable tolling due to mental

4    impairment requires the petitioner to meet a two-part test:"

5             1) *First*, a petitioner must show his mental impairment was an
                  "extraordinary circumstance" beyond his control, see *Holland*, 130

6             S.Ct. [2549 ]at 2562 [(2010)], by demonstrating the impairment
                  was so severe that either

7

8             (a) petitioner was unable rationally or factually to
                  personally understand the need to timely file, or

9             (b) petitioner's mental state rendered him unable
                  personally to prepare a habeas petition and

10            effectuate its filing. [Footnote 2–see below]

11            2) *Second*, the petitioner must show diligence in pursuing the
                  claims to the extent he could understand them, but that the mental

12            impairment made it impossible to meet the filing deadline under
                  the totality of the circumstances, including reasonably available

13            access to assistance. See *id.*

14   Bills v. Clark, 628 F.3d 1092, 1099-1100 (9th Cir. 2010) [emphasis in original].

15            At footnote 2, the panel clarified that, under the first prong, the required elements

16   are broader, that is, disjunctive rather than conjunctive, stating:

17            The magistrate judge stated a habeas petitioner must show "he was
                  unable by reason of mental defect to understand his need to timely

18            file a habeas petition *and* unable to take steps to effectuate that
                  filing." ([E]mphasis added).  Under our formulation, a petitioner

19            would be entitled to equitable tolling if he could show either of
                  those conditions were met: *either* he did not understand his need to

20            timely file *or* his mental impairment made him unable to take steps
                  to effectuate that filing.  In either case, if the mental impairment is

21            so severe that it causes the untimely filing, the petitioner is entitled
                  to equitable tolling. [Emphasis in original.]

22

23            The Ninth Circuit stated that the record did not address whether petitioner had

24   been diligent in seeking assistance or whether there was any assistance reasonably available to

25   him.  "The court should examine whether the petitioner's mental impairment prevented him from

26   locating assistance or communicating with or sufficiently supervising any assistance actually

1   found."  Bills v. Clark, 628 F.3d at 1101.

2   _Request for Judicial Notice_

3          Petitioner has asked the court to take judicial notice of the following: 1) the

4   Armstrong v. Davis court-ordered remedial plan implemented by the California Department of

5   Corrections and Rehabilitation (CDCR) appended as Exhibit A (formerly Armstrong v. Brown

6   and Armstrong v. Wilson, 942 F. Supp. 1252 (N.D. Cal. 1996); 2) Ex. B, the Clark v. [State of]

7   California, 123 F.3d 1267 (9th Cir. 1997), remedial plan implemented by CDCR; 3) Ex. C,

8   Findings of Fact and Conclusions of Law in Clark v. California, No. 3:96-cv-1486 CRB (N.D.

9   Cal. Sept. 16, 2010), subsequently authored by Judge Breyer at docket # 500; 4) Ex. D, expert

10  declaration of Nancy Cowardin,[3] referenced in preceding findings of fact; 5) Ex. E, as an accurate

11  true copy of the Sacramento County Superior Court, charging petitioner with possession of a

12  sharp weapon while incarcerated and alleging a prior child molestation conviction as one of

13  petitioner's strike priors.  See docket # 76.

14         Under Fed. R. Evid. 201(b), a court may take judicial notice of a fact not subject

15  to reasonable dispute, either because the fact is generally known within the territorial jurisdiction

16  of the trial court or because the fact is capable of accurate and ready determination from sources

17  whose accuracy cannot be reasonably questioned.  Pursuant to Fed. R. Evid. 201(c), a court may,

18  on its own, take judicial notice of an adjudicative fact or "must take judicial notice if a party

19  requests it and the court is supplied with the necessary information."

20         Except as to petitioner's Ex. E – the information filed in Sacramento County

21  Superior Court, respondent objects to judicial notice being taken of the petitioner's exhibits, i.e.,

22  those attached to the request as Exs. A-D.  Docket # 78.  Respondent argues that judicial notice is

23  being sought for facts that are irrelevant to the question of equitable tolling at issue and is

24

25         [3] At one point, petitioner herein attempted to engage Dr. Cowardin as an expert witness
    with respect to the question, inter alia, of the efficacy, or lack thereof, of TABE testing.  See, e.g.,
26  docket # 80.

4

1   therefore inappropriate, citing Ruiz v. City of Santa Maria, 160 F.3d 543, 548 n. 13 (9th Cir.

2   1998) (denying request for judicial notice of election results in part because the results not

3   relevant for appellate issue); Turnacliff v. Westly, 546 F.3d 1113, 1120 n. 4 (9th Cir. 2008)

4   (judicial notice of irrelevant U.S. Treasury records denied; Flick v. Liberty Mut. Fire Ins. Co.,

5   205 F.3d 386, 39[3] n. 7 (9th Cir. 2000) (denying request for judicial notice of historical statistics

6   not relevant to an appeal issue).  Respondent also contends that petitioner has not met his burden

7   to show the facts are properly the subject of judicial notice, citing Hurd v. Garcia, 454 F. Supp.2d

8   1032, 1054-55 (S.D. Cal. 2006) (burden on party requesting judicial notice to persuade judge

9   "that the fact is a proper matter for judicial notice" [internal citation omitted]).   Respondent

10  avers that petitioner has failed to establish that facts within the documents at Exhibits A through

11  D are not subject to reasonable dispute, noting, e.g., that the report at Ex. D, was generated by an

12  expert witness who was retained and paid by a party to a lawsuit and that petitioner has not

13  demonstrated that the opinions and alleged facts therein are not reasonably disputable.

14  Respondent also posits that judicial notice of the truth of a court's findings and conclusions in

15  another case is not appropriate.

16          While documents that are public records may be judicially noticed for the purpose

17  of showing the occurrence of a judicial proceeding that a particular document was filed in

18  separate court case, but judicial notice for the truth of the findings of facts from another case is

19  not appropriate.  Wyatt v. Terhune, 315 F.3d 1108, 1114 n. 5 (9th Cir. 2003) ('[f]actual findings

20  in one case ordinarily not admissible for their truth in another case through judicial notice"); Lee

21  v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001) (while court may take judicial notice

22  of "matters of public record," it may not take judicial notice of any fact "subject to reasonable

23  dispute"); United States v. Jones, 29 F.3d 1549, 1553 (11th Cir. 1994) ("a court may take notice

24  of another court's order only for the limited purpose of recognizing the 'judicial act' that the

25  order represents or the subject matter of the litigation").

26  \\\\\

1    To the extent petitioner asks for judicial notice of Ex. A, <u>Armstrong v. Davis</u>

2   court-ordered remedial plan and Ex. B, the <u>Clark v. California</u>, remedial plan, both implemented

3   by CDCR, the court finds that petitioner has failed to meet his burden to show the relevance of

4   these documents to the question before the court.   In that regard, this court's review of the case

5   docket shows a stipulation by counsel for both parties to the statement that, while incarcerated in

6   CDCR, petitioner "does not have a history as being a designated person for services pursuant to

7   <u>Armstrong v. Wilson</u> or <u>Clark v. California</u>."   <u>See</u> docket # 72.   This makes the relevance of

8   these remedial plans even more obscure to the undersigned.   In addition, respondent is correct

9   that petitioner does not make clear the source of the copies of the plans and thus fails to

10   authenticate them or to verify any official source.   As to Ex. C, the court will take judicial notice

11   of the Judge Breyer's Findings and Conclusions of Law in <u>Clark v. California</u>, No. 3:96-cv-1486

12   CRB (N.D. Cal. Sept. 16, 2010), but only on the basis that a court may take judicial notice of

13   court records, <u>Barron v. Reich,</u> 13 F.3d 1370, 1377 (9th Cir. 1994); <u>MGIC Indem. Co. v.</u>

14   <u>Weisman</u>, 803 F.2d 500, 505 (9th Cir. 1986); <u>United States v. Wilson</u>, 631 F.2d 118, 119 (9th

15   Cir. 1980), and not for the truth of the matter therein asserted.   As to Ex. D, the report of an

16   expert witness retained by the plaintiff class in <u>Clark v. California</u>, No. 3:96-cv-1486 CRB,

17   petitioner neither demonstrates the relevance of the report or that it contains facts that could not

18   reasonably be disputed.   The court does take judicial notice of Ex. E, which is part of the record

19   of petitioner's criminal conviction at issue in this case.

20                      *Equitable Tolling*

21    The question before the court on remand is whether petitioner is entitled to

22   equitable tolling for any of the time from the date of the denial of his state Supreme Court

23   petition on October 12, 2005 (at which point there were still 74 days to run on the statute) until

24   the filing of the instant petition on October 10, 2006.   Petitioner claims entitlement to equitable

25   tolling for that entire period.   Docket # 24, p. 2.   Therefore, the court must determine precisely

26   whether petitioner is entitled to equitable tolling at any period between October 12, 2005, and

1    October 10, 2006,[4] or for the entire period, being mindful that equitable tolling is only

2    appropriate during the delay caused by circumstances beyond a petitioner's control.   Corjasso v.

3    Ayers, 278 F.3d 874, 879 (9th Cir. 2002).[5]   Petitioner's claim to entitlement to equitable tolling

4    is based on his contentions that he is unable to read and write, suffers from neurological deficits,

5    has a borderline to mildly retarded level of intelligence and a concurrent psychosis, and because

6    assistance was not available to him.[6]  See Bills v. Clark, 628 F.3d at 1094.

7        *Applicable Standard*

8             On remand, as noted above, the Ninth Circuit set forth a two-part test as the

9    standard for determining equitable tolling eligibility arising from mental impairment:

10             (1) *First*, a petitioner must show his mental impairment was an
             "extraordinary circumstance" beyond his control,  see *Holland*, 130

11           S.Ct. at 2562, by demonstrating the impairment was so severe that
             either

12                  (a) petitioner was unable rationally or factually to

13                  personally understand the need to timely file, or

14                  (b) petitioner's mental state rendered him unable
                  personally to prepare a habeas petition and

15                  effectuate its filing. [Footnote 2 omitted]

16             (2) *Second*, the petitioner must show diligence in pursuing the
             claims to the extent he could understand them, but that the mental

17           impairment made it impossible to meet the filing deadline under
             the totality of the circumstances, including reasonably available

18    _____

19           [4] To the extent that petitioner's counsel states that petitioner is entitled to equitable tolling
      from the date of the denial by the state supreme court of the petition for review, which occurred

20    on October 29, 2003, but after which petitioner was able to file a pro se petition for writ of
      habeas corpus in the state supreme court, on November 15, 2004, subsequently denied on Oct.

21    12, 2005, the court assumes that this is simply an erroneous reference to the state supreme court
      decision at issue.

22
             [5] If petitioner is entitled to equitable tolling for any period on or after Oct. 10, 2005, then

23    the 74 days he had left to run on the statute would still remain for any period for which he would
      not be entitled to such tolling.

24
             [6] The appellate court made clear, in denying petitioner's request for a certificate of

25    appealability under the Americans with Disabilities Act, that petitioner's ADA claim "does not
      assert the denial of a constitutional right, and the district court correctly denied Bills a COA on

26    this issue."  Bills v. Clark, 628 F.3d at 1096, n.1.

1    access to assistance.  See id.

2    Bills v. Clark, 628 F.3d at 1099-1100 [emphasis in original].

3           The availability of assistance is an important element to a court's
             diligence analysis. For example, if prison officials or even other
4            prisoners were readily available to assist Bills in filing his habeas
             petition but Bills refused to accept their assistance, a court could
5            conclude Bills may not have been diligent in pursuing his claims
             such that he is entitled to equitable tolling. That is not to say a
6            prisoner fails the diligence requirement for refusing jailhouse
             assistance. It is only part of the overall assessment of the totality of
7            circumstances that goes into the equitable determination. Thus, in
             many circumstances, the existence of such help would be highly
8            relevant to the question of whether a petitioner's mental condition
             made it impossible to file a timely petition. But the availability of
9            jailhouse assistance could also cut the other way. If legal help is
             available only because a prisoner has to resort to bribery or
10           succumb to extortion, and a prisoner does not do so, a court would
             not find a lack of diligence. Here it is unclear what assistance Bills
11           had and how that assistance, if any, bore on his ability to meet the
             filing deadline.

12

13   Id., at 1101.

14                    *Facts Determined at First Evidentiary Hearing*

15          The undersigned repeats those facts which he found at the first evidentiary

16   hearing, as such facts play a part in the ultimate decision here.

17          In testing and evaluation, two psychologists have found that petitioner has a below

18   average intellectual capacity with very limited verbal skills, reading at a second

19   grade level, as well as difficulty with math.  Opp., Ex. B, Shawn Johnston, Ph.D.,

20   letter dated 12/03/01; Ex. E, Declaration of John S. Miller, Ph.D (petitioner's

21   expert).  A third psychologist found that petitioner's language usage and content

22   was in the range of low average to borderline.  Opp., Ex. B, Letter of John Alan

23   Foster, Ph.D., dated 11/30/01. [FN 5][7]  Dr. Foster states that petitioner was able to

24

25        [7] [FN 5] Both Drs. Johnston and Foster in late 2001, performed competency evaluations,
     pursuant to Cal. Penal Code § 1367, for the purpose of determining whether petitioner was
     competent to stand trial at or around that time.  *The undersigned emphasizes that he understands*
26   *that petitioner's competency to file a habeas petition is not necessarily decided by his*

count backwards and do simple math calculations (addition/subtraction), although

petitioner would or could neither count forward nor backward for Dr. Johnston.

Both Drs. Johnston and Foster found petitioner oriented to person, place and time.

Dr. Johnston found petitioner possessed some abstract thinking capacity when he

was able to interpret two simple proverbs, but Dr. Foster found petitioner had

difficulty in explaining the meaning of proverbs.  To Dr. Johnston petitioner

denied he was physically abused by his mother and her boyfriends, but petitioner

told Dr. Miller that he and his siblings had been subjected to beatings as children.

Dr. Johnston found, at the time of his evaluation, that the petitioner was suffering

"from a crack cocaine dependency disorder, an underlying antisocial personality

disorder, and a possible schizophrenic disorder," noting that petitioner told him

that he heard voices, even though he was receiving psychiatric medication at that

time.  Opp., Ex. B, p. 4.  There appeared to be some question for Dr. Johnston as

to the genuineness of the auditory hallucinations to which petitioner attested

(which hallucinations he also reported to Dr. Foster and which Dr. Foster noted

were included as reported symptoms in his prison medical record), but even

assuming that petitioner was experiencing such hallucinations, Dr. Johnston

nevertheless found petitioner to be competent to proceed to trial, concluding, after

determining, inter alia, that petitioner understood the roles of the "various judicial

actors," that: "even though this defendant undoubtedly has a plethora of

significant psychological problems, he most definitely appears to understand the

competency at a previous time; however, evidence of competency a relatively short time prior to the period in question may well be relevant to competency during the time period in question. The degree of relevancy is determined on the nature of the alleged mental deficiencies, and their ability to wax and wane.  For example, a drug induced mental retardation may improve somewhat when the drugs are removed from the environment; a congenital mental retardation is not likely to improve.  In either case, the evidence adduced in the prior period concerning the cause of mental deficiencies would be relevant – one discounting petitioner's arguments here and one supporting those arguments.

nature of the charges and proceedings against him and is capable of working with his attorney in preparing a rational defense in his case.  He is competent."  Id., at 4-5.  While at the evidentiary hearing, petitioner's expert, Dr. Miller, pronounced petitioner to be "severely disabled," he expressly did not dispute Dr. Johnston's report and findings, although he questioned some of Dr. Foster's evaluation.  See [First] Evidentiary Hearing.  Dr. Foster noted in his 2001 letter that prison medical [records] indicated that he had been treated for "a bipolar condition and psychotic disorder due to head trauma/alcohol dependence" and was prescribed Divalproex and Risperidone by a psychiatrist.  Opp., Ex. B.  Dr. Foster noted that the medical records also indicated that petitioner was in the CCCMS [FN 6][8] program, was regularly seen by psychiatric staff, but was not participating in treatment groups.  Petitioner evidently also told Dr. Foster that he had received a head injury in a vehicle accident at nineteen or twenty years of age, and that he had used alcohol, marijuana and cocaine for many years from his early youth.  Dr. Miller reports that petitioner told him he had used alcohol since he was a kid, but was not able to say at what age he began, while Dr. Foster reported that petitioner told him that he began drinking at age ten.  Opp. Ex. B, Ex. E., p. 5. [FN 7][9]  Dr. Miller reported that petitioner informed him that he had had numerous alcohol related blackouts; had used cocaine since the mid-eighties until his present incarceration and also had smoked it; and used methamphetamines even while in prison; had once tried heroin; and had taken many pills, including Valium and Qualudes.  Opp., Ex. E, p. 5.

\\\\\

[8] [FN 6] Correctional Clinical Case Management Services.

[9] [FN 7] The court's electronic docketing pagination is referenced.

There is some confusion as to petitioner's educational background: Dr. Johnston reported that petitioner said he graduated from high school in the California Youth Authority (CYA) in 1988, and Dr. Miller also reports that his highest level of education was his CYA high school graduation, while Dr. Foster states that petitioner attended both public high school and school in CYA, but told him he graduated, June of 1988, from Castlemont High School, after which he completed one unidentified class at Los Modanos College.  Opp., Ex. B; Ex. E, p. 5.  Dr. Miller adds that petitioner told him that he attended special education classes throughout his education, but petitioner was apparently unable to submit records to clarify his educational background, an omission respondent has noted.

Dr. Miller rendered his evaluation of petitioner's mental/intellectual capabilities and limitations after meeting with him and giving him tests more recently and, evidently, for a significantly more extended period of time than Drs. Johnston and Foster.  See [First] Evidentiary Hearing & Opp., Ex. E.  Dr. Miller testified to spending 9-10 hours on each of two days with petitioner for the purpose of evaluating petitioner's cognitive capabilities, limits and disabilities, on November 15-16, 2007.  Id.  Whereas petitioner evidently did not report visual hallucinations in the earlier assessments referenced above, to Dr. Miller he reported both auditory and visual hallucinations.  Opp., Ex. E, p. 3.  Dr. Miller found petitioner oriented to person, place and situation but not well-oriented to time as to the day of the week and month.  Petitioner was unable to subtract serially 7s or 3s and unable to spell "world" backwards or forwards.  Petitioner reported to Dr. Miller that his mother had died in 1999 and also told him, in contrast to what he had reported to Dr. Johnston, that he and his siblings "used to get beat up all the time." Id. at 4.

11

In petitioner's medical history, in addition to noting petitioner's head trauma in his twenties from a motor vehicle accident, Dr. Miller also reports petitioner's psychiatric/mental health history from prison medical records dating back to 1997. In August of 1997, petitioner was evaluated as having perceptions "positive for auditory hallucinations," having "persecutory delusions" and poor judgment and insight. The "diagnostic impression offered" referenced "Psychotic Disorder NOS and Antisocial Personality Disorder" with a global assessment function (GAF) score of 55. Petitioner was found to be appropriate to receive the CCCMS level of care. Opp., Ex. E, p. 7. It was nevertheless noted that while his speech was observed to be rapid at times "his appearance, behavior, mood, intellectual functioning, and speech were all considered to be within normal limits...." Id. On October 20, 1997, the mental health evaluation noted petitioner's admission to a psychiatric hospital in 1990 and 1993 (this contrasts with a mental health evaluation conducted on June 19, 2003, wherein petitioner was noted to have had no history of admission to a psychiatric hospital), found his perceptions to be positive for both visual and auditory hallucinations, noted a history of substance abuse and mental health problems. Opp., Ex. E, pp. 7, 9. Petitioner attributed the inception of his hallucinations to his use of cocaine. The diagnostic impression was that petitioner had Substance Induced Psychotic Disorder, this time with a GAF of 60. Petitioner was prescribed Mellaril. Id. Again during that evaluation, "his appearance, behavior, mood, intellectual functioning, and speech were all considered to be within normal limits." Id.

In August of 1999, in being assessed for a mental health treatment plan, according to Dr. Miller, petitioner's mental health records noted petitioner to have speech difficulties (pressured) and to be in an irritable mood; nevertheless, "his

appearance, behavior, intellectual functioning, perceptions, thought content, sensorium, insight and judgment were all considered to be within normal limits"; the diagnostic impression was of Psychotic Disorder and Antisocial Personality Disorder, with a GAF of 60. Id., at 7-8.

In September of 2000, while his appearance, behavior, mood, intellectual functioning, thought content and sensorium were considered within normal limits, he was noted to have "mildly impaired" speech attributable to "racing thoughts," sleep patterns outside normal limits, and poor insight and judgment. The diagnostic impression this time was of Bipolar Disorder with Hypomania and Psychotic Features and Antisocial Personality Disorder with a GAF of 55. On June 19, 2001, according to Dr. Miller, petitioner's mental health records again showed petitioner had, inter alia, racing thoughts which mildly impaired his speech, problems sleeping with poor insight and judgment. The diagnosis was "Bipolar Disorder Manic Moderate, deferred on Axis II and a GAF of 55." Opp., Ex. E, p. 8. His November 16, 2001, evaluation in administrative segregation (ad seg) showed him to have a "'stressed out'" mood, but with "appearance, behavior, intellectual functioning, thought content, sensorium, insight and judgment within normal limits." Id. He was prescribed Depakote and Risperdal, diagnosed with "Bipolar Disorder Manic Moderate by History, deferred on Axis II and a GAF of 60." Id.

A February, 2002, evaluation found petitioner to be having sleeping problems, to again be within normal limits as to appearance, mood, behavior, intellectual functioning, perceptions, insight and judgment, etc., still diagnosed as having Bipolar Disorder but with a GAF of 60. Id., at 8-9. In an April, 2002, evaluation,

petitioner was found to be in an irritable mood, complaining of stress arising from a court case and "noted to be grandiose and entitled with poor insight and judgment."  While the diagnostic impression noted Bipolar Disorder, the GAF fell to 45.  Id., at 9.

A June 19, 2003, evaluation found petitioner to have sleep problems and elevated mood, presenting with Bipolar and Antisocial Personality Disorders with a GAF that rose to 62.  His appearance, behavior, intellectual functioning, speech, etc., were again within normal limits. He was prescribed Seroquel and Depakote.  Id. On November 14, 2003, petitioner was agitated and angry, with inappropriate affect, sleep outside normal limits, with "over focused, obsessive and tangential" intellectual functioning.  He had a similar diagnosis as previously set forth, GAF of 60, with medication continued.  Id., at 9-10.  In October of 2004, according to Dr. Miller's reading of the petitioner's mental health records, petitioner was depressed, reported hearing voices, agitated, was continued on meds, with a diagnostic impression of "Bipolar Disorder NOS, Schizophrenia Undifferentiated Type, Antisocial Personality Disorder, a history of femur problems, and a GAF of 58."  Id., at 10.  In October of 2005, a similar working diagnosis was given (this time with a GAF of 63), petitioner having presented with an agitated affect, poor insight and judgment, tangential speech.  Once again on September 14, 2006, the same diagnosis applied, and petitioner had a GAF of 65.  He was agitated and hyperverbal, but presented with appearance, intellectual functioning, perceptions, thought content, insight and judgment, etc. within normal limits.  Id., at 10.  On March 14, 2007, petitioner presented as agitated and angry, his sleep reportedly limited to four to six hours, reporting auditory hallucinations "since 1997," showing poor insight and judgment.  The diagnostic impression was "Bipolar

14

1  Disorder NOS, Schizophrenia Undifferentiated Type, Antisocial Personality

2  Disorder, a history of femur problems, and a GAF of 55."  On May 18, 2007,

3  petitioner, who appeared angry, was having sleep difficulties and claimed to be

4  hearing voices which he did not want to talk about.  The diagnosis was "rule out

5  Depressive Disorder NOS, Antisocial Personality Disorder, and a GAF of 62.

6  Medication and CCCMS treatment were continued."   On November 7, 2007,

7  petitioner was in an irritable mood and "given working diagnosis of Bipolar

8  Disorder NOS, Antisocial Personality Disorder, a history of femur problems, and

9  a GAF of 55."  Id. at 11.

10

11  In the battery of tests conducted on petitioner by petitioner's expert, Dr. Miller,

12  petitioner tested in the "extremely low" range on Wechsler Adult Intelligence

13  Scale, Third Edition (WAIS-III), that is, in the first percentile relative to his age

14  group in verbal cognitive functioning, with a score of 64 on Verbal IQ, 67 on

15  Verbal Comprehension and 61 on Working Memory.  Opp., pp. 11-12.  Dr. Miller

16  found petitioner to show relative strength in common-sense reasoning; working

17  memory (notwithstanding the low score at which he assesses petitioner

18  immediately preceding on this facet); attention; sequencing ability; alertness to

19  visual detail, fluid reasoning using visual stimuli.  Id., at 12.  Petitioner was

20  relatively weak on simple calculations without pencil and paper.  Dr. Miller

21  emphasizes petitioner's limited verbal comprehension and ability.  Id., at 12-13.

22  On the Wechsler Memory Scale, Third Edition (WMS-III), according to Dr.

23  Miller's testing, petitioner's general memory functioning showed in the low

24  average range, with his ability to recall newly learned information in the

25  borderline range.  Id., at 13-14.  Dr. Miller found that petitioner did not show

26  retention difficulties for auditory memory, nor were retention difficulties for

visual memory significant, but ranked his overall delayed memory abilities in the low average range.  Id., at 15.  Dr. Miller found that, peculiarly, petitioner was better able to recall information initially given verbally without auditory cues (top of low average range) than with cues (bottom of low average range).  Id.  In the test of nonverbal intelligence, Third Edition (TONI-3), considered a fairer test of intellectual ability for ethnic minorities and the handicapped with a focus on problem-solving and abstract reasoning, petitioner showed a low average range of nonverbal intelligence with an IQ of 85 placing him at better than 16% of the population in nonverbal intelligence.  Other tests administered by Dr. Miller showed petitioner to have an overall intellectual ability in the low average range, with his oral language skills within normal limits for those at his age level, and with low basic reading skills.  Opp., Ex. E, pp. 16-18.  Further tests administered by Dr. Miller suggested that petitioner "has difficulty with the fundamental verbal skill of letter sequencing."  Id., at 19.  Petitioner showed some problem-solving ability, but testing showed limitations in the ability to discern "broad, connecting sorting principles" and his particular vulnerability to distractibility.  Id., at 22. Petitioner was most vulnerable "in letter fluency and sequencing, cognitive flexibility, divided attention, naming speed, initiation of verbal responses and perseverative [FN 8][10] tendencies."  Id., at 23.  Petitioner does find tasks involving motor speed, visual scanning and number sequencing "relatively easier." Id., at 24.  Varying testing suggested petitioner "has substantial difficulties with attention and hyperactivity"; "an impaired ability for abstract concept formation"; inadaptability; overall, "significant neurological deficits."

_____

[10] [FN 8] Dr. Miller describes petitioner's perserverating test responses as "meaning they are 'stuck' on fixed ideas,"  indicating "possible impairment in initiation of tasks and concept formation skills."  Opp, Ex. E, p. 34.

Id., at 25-26.  The Wide Range Achievement Test, Revision 3 (WRAT-3) showed petitioner to be reading and spelling at the second grade level and doing arithmetic at the first grade level.  Id., at 26-27.  The Nelson-Denny Reading Test showed that petitioner had "substantial difficulties in reading." Id., at 27-28.  Dr. Miller found petitioner's responses on the Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2), to be uninterpretable due to petitioner having "an unrealistically negative level of personality functioning." Id., at 28.  The Million Clinical Multiaxial Inventory, Third Edition (MCMI-III) suggested that petitioner evidenced "either great turmoil, had a tendency to complain, or that he may have an inclination to magnify his difficulties," noting "his tendency to exaggerate or complain," and his inclination, inter alia, to self-sabotage and feeling victimized. Id., at 28-29.  Dr. Miller suggested the following plethora of possible diagnoses for petitioner: "Schizophrenia Paranoid type, Posttraumatic Stress Disorder, Adjustment Disorder with Anxiety, Depressive Personality Disorder, Passive-Aggressive Personality Disorder, or Borderline Personality Disorder with Sadistic Personality Traits." Id., at 29.

In sum, Dr. Miller attributes petitioner's low functioning level to "intrauterine, environmental, learned and acquired deficits," noting that various test scores showed petitioner "demonstrated a Reading Disorder and Expressive Language Disorder that coexists with a Borderline IQ." Id., at 32.  Dr. Miller testified to petitioner having under Axis I (of his DSM IV Diagnosis), a Schi[z]oaffective Disorder; under Axis II, an Antisocial Personality Disorder; under Axis III, Traumatic Brain Injury & Injury to Femur; within Axis IV, Psychosocial Stressors: incarceration, Axis V, GAF of 40.  See [First] Evidentiary Hearing; Opp, Ex. E at 33.  Dr. Miller avers that petitioner's neurological deficits as

17

discerned through his testing demonstrate that petitioner could not understand the habeas form and written directions without assistance, that petitioner even lacks the ability to put words in alphabetical order.  Id., at 34-35; [First] Evidentiary Hearing.

Respondent's Ex. A contain copies of various handwritten motions signed by petitioner related to his trial, including, inter alia, a subpoena for a trial witness, a motion to have his case sent back to the CDC, and 995 motions.  When asked during cross-examination at the [first] evidentiary hearing about his authorship of these documents filed pro se at his trial, petitioner conceded that it was written in his handwriting, but that he copied it from an unnamed "neighbor"; as to one motion, declaring that he had "copied every last page off another person's handwriting."  Respondent's Ex. B includes several work supervisor reports: the latest is dated 9/29/05, showing that his CDC work supervisor wished to retain him in his job as a line server in the central kitchen; an earlier report is dated 11/01/04, regarding petitioner's kitchen job as a hand packager, wherein petitioner is described as one who "works hard and is a co-operative worker" and is accorded a pay increase; finally, two copies of a report, dated 8/01/04, both marking petitioner for the same pay increase for his packager job, and in one version, bearing the notation that petitioner "has a good attitude and is a hard worker."  Respondent's Ex. C contains, inter alia, a copy of a 602 appeal, dated 4-11-01, complaining about R.N. Ventefenille's alleged failure to provide him appropriate medical care for a gash on his forehead petitioner received falling out of his bunk, an allegation which gave rise to the copy of the civil rights action exhibited as respondent's Ex. D.  Petitioner testified in the hearing that he had copied the words of the complaint.  When asked to turn to Ex. E by respondent's

counsel, petitioner asked, "Is that the one after D?"  As to the September 22,
2003, petition for review contained therein, which appears to also include a one-
page handwritten insert, petitioner testified that "Troy" had typed the petition in
three days, petitioner had signed it after Troy read it to him and that Troy went
with him to the law library to get it sent off.  Respondent's Ex. I is a copy of
petitioner's 2000 pro se federal petition filed in the Northern District on his
conviction, pursuant to Cal. Penal Code § 288 [FN 9],[11] not at issue in this case.
The document contains a typewritten and handwritten portion.  Petitioner testified
that he did not type the document but conceded that he had done the handwriting,
protesting that the handwritten portion indicates he did not know what he was
doing.  He indicated that he signed it and gave it to prison officials to mail.
Petitioner submitted as Ex. C to his opposition a declaration from an inmate
named Troy Anthony Rhodes, signed on March 3, 2007, stating that petitioner had
approached him at some unspecified time "with a request to assist him in putting
together a petition for habeas corpus relief with the state and federal courts I
willing [sic] accepted the task."   In his declaration, Inmate Rhodes declares that
petitioner could barely read his own trial transcripts and states his serious doubts
as to petitioner's ability to file his own habeas petition unaided in a timely
manner.   In his testimony, petitioner estimated, vaguely, that he provided Troy
with the transcripts maybe in 2004, and referenced unspecified lengthy lockdowns
at Corcoran; he was unable to clarify how or if Troy was paid for his work.

In supplementally lodged documents, respondent submitted transcripts of
petitioner's trial, wherein petitioner represented himself.  The court has reviewed

---

[11] [FN 9] Cal. Penal Code § 288 sets forth the punishment/sentencing range for a person
convicted of committing lewd/lascivious acts upon on a child under 14.

1   petitioner's closing argument (respondent noted that petitioner, in addition to

2   filing motions pro se, also called witnesses, and addressed the jury in an opening

3   statement and closing argument).  While petitioner shows his "perseverating"

4   tendencies in his summation and much of his argument may be misdirected, he

5   shows an ability to comprehend and articulate that indicates he has followed the

6   trial and understands what is at issue.  See Suppl. Lodged Item No.1, RT, 1169-

7   1195.  In addition, when petitioner was on the stand at the hearing, petitioner on

8   occasion appeared to undermine his own credibility in his effort to convince the

9   court of his deficiencies.  For example, although records indicate that petitioner

10  has in the past been able to convey his birthdate without confusion, see Opp., Ex.

11  B, wherein both Drs. Johnston and Foster recorded petitioner's birthday as

12  October 7, 1969, with Dr. Johnston expressly stating that petitioner had told him

13  his birthdate, on re-direct at the hearing, petitioner sounded confused and was

14  only able finally to articulate his birthday as being "October sixty-something."

15  The professed confusion as to whether E followed D in respondent's exhibits also

16  did not ring true.  Also, petitioner grew quite impassioned at the end of the

17  hearing (when he was off the stand), when respondent's counsel pointed out the

18  disparities in petitioner's denial in the record of physical abuse, later claiming to

19  have been beaten as a child by his mother and others.  Petitioner declared,

20  essentially, that he had refused to acknowledge the physical abuse before his

21  mother died because he did not wish to implicate her criminally or otherwise.

22  However, as respondent noted, petitioner was denying the physical abuse (see Dr.

23  Johnston's report) in 2001, even though his mother had apparently died in 1999.

24  from Findings and Recommendations, filed on September 18, 2008  (docket # 44), pp. 9-20,

25  adopted by Order filed on October 8, 2008 (docket # 46).

26  \\\\\

1

*Additional Facts from Second (Supplemental) Evidentiary Petition*

2        At the second/supplementary evidentiary hearing, Inmate Troy Anthony Rhodes

3 testified for petitioner.  Petitioner also retained the services of John S. Miller, Ph.D, who had

4 testified as an expert witness at the initial hearing.  Respondent presented as an expert witness,

5 Dale Hamad, Ph.D.,[12] employed by CDCR as a supervisor of academic instruction and vice-

6 principal of an adult school at California State Prison-Represa.

7        *Rhodes Testimony*

8        Witness Rhodes identified the pro se federal habeas petition filed in this case as

9 the one with which he assisted petitioner which he states was filed on October 3, 2006, and

10 which he testified took him about four or five months to prepare after receiving trial records.

11 Second Evidentiary Hearing Transcript (hereafter, SEHT), at 10-13,[13] Ptnr Ex. 1, Resp. Ex. F.

12 Mr. Rhodes testified at the 2012 hearing that he had a GED, had been a jailhouse lawyer for

13 25/26 years, beginning at San Quentin, where he worked in the library and processed paperwork

14 and filed requests on behalf of death row inmates, and that he had met petitioner at the California

15 Substance Abuse Treatment Facility in Corcoran "in late 2005, early 2006."  Id. at 10:6-9, 13:19-

16 25, 14: 1-3.  Rhodes testified that petitioner was unable to read the trial record or assist him in

17 preparing the petition or to understand simple terms, such as "discretion."  Id., at 19-20 & Ptnr's

18 Ex. 2, Rhodes Declaration dated March 3, 2007.  When Rhodes asked petitioner about a specific

19 hearing that he believed should have been part of the trial transcript but which he could not

20 locate, Rhodes testified petitioner could not follow him.  Id., at 16: 9-17.  On direct examination,

21 when asked if there would be any advantage to petitioner's "playing dumb" at that point with

22

_____

23        [12] In addition to a doctorate in sociology, Dr. Hamad testified to having earned a Bachelor
of Science degree (social science), two masters degrees – one in sociology and another in
24 educational leadership – and six teaching credentials.  SEHT (docket # 116), 168:7-12.

25        [13] When page numbers are cited for the evidentiary hearing transcript, they refer to those
pages as numbered/contained within the transcript itself and not the page numbers superimposed
26 next to "document # 116" in the court's docketing system of pagination.

Rhodes, Mr. Rhodes responded that in a prison environment, one would not want to appear slow

as it could make one a "target" for "predatory behavior. Id., at 16:18-25, 17:1-7.  To the question

as to whether "a 288 prior" would have an effect on a person's "vulnerability in prison" (id., at

17:8-9), Rhodes responded:

> Yeah.  Any time you have any type of crime like that, in fact, I
> have a sexual assault, so, you know, I understand the position that
> some people can put themselves in.  I don't have that problem, but
> I understand where that problem could - - it could, you know, it
> could hurt you, sure.

Id., at 17:24-25, 18:1-4.

Rhodes also testified that people would "extort you" if they knew "certain things

about your case... ." and that "things could get very complicated" if an inmate simply went out on

the yard "to talk to anybody who claims to be a jailhouse lawyer... ."  SEHT, 18:9-12; 25:25,

26:1-7.  Mr. Rhodes also testified that CDCR policy is that while working in the law library,

inmates who are library technical assistants are not to work as jailhouse lawyers.  Id., at 22-23.

However, the law library is only open ten days a month, when the library technical assistants are

working.  Id., at 23-24.

On cross-examination, Rhodes testified that "another Troy," whose last name the

witness did not know, he believed had assisted petitioner in preparing state court habeas work

"but he was also using Mr. Bills' paperwork as an issue of extortion.  That's how Mr. Bills

actually ended up coming and talking to me about that."  SEHT, 28:23-25, 29:1-7, 20-24.[14]

When respondent's counsel pointed out that in his declaration at Exh. 2, Rhodes had stated that

he had accepted petitioner's request to put together a habeas petition "with the state and federal

courts," Mr. Rhodes explained that the reference to a state court habeas petition was probably to

address the possibility of needing to file an exhaustion petition in state court, but maintained that

---

[14] The witness admitted that he had not heard the other Troy himself say he was extorting
petitioner but apparently based this assertion, which respondent pointed out was hearsay, on his
knowledge of "everybody" at SATF and "who the crooks are... ."  Id., at 29:10-18.

1  he did not believe he had filed a state habeas petition for petitioner and did not remember

2  whether he had filed a state exhaustion petition.  Id., at 30-32.  Mr. Rhodes testified that he could

3  not remember whether he had done any inmate appeals for petitioner.  Id., at 30:4-6.  Had been at

4  SATF since "about May of 2000" and has worked "off and on" in the law library since 2003 to

5  the present.  Id., at 30: 8-19.

6           Under the court's questioning, Mr. Rhodes stated that petitioner provided him

7  with his case transcripts after Rhodes agreed to help petitioner and asked for them.  SEHT 36:3-

8  10.  Mr. Rhodes testified that petitioner could respond to "real simple questions" such as what

9  day he went to court or what a person's name was but not to questions about such things as

10  whether there had been a shackling hearing nor did he have any awareness as to whether he even

11  should have had one .  Id., at 37: 9-17.  Mr. Rhodes did not recall ever meeting him before

12  petitioner approached him in the law library and testified that petitioner never indicated to him

13  that the federal petition was late and brought him paperwork that he did not even read.  Id., at 37-

14  38.

15           *Petitioner's Testimony*

16           When petitioner was asked by his counsel if he was afraid to show his paperwork

17  to anyone to try to enlist help in preparing a federal habeas petition, petitioner testified that he

18  was "kind of leery" about showing his case to someone because of the § 288 conviction and

19  information to that effect could get petitioner beaten or stabbed.  SEHT, at 46-47.  Petitioner

20  confirmed that he attempted to obtain help with his filings from a different Troy, but after he

21  began to help, "he just all of a sudden like stopped, like he wanted me to pay him all this extra

22  money for whatever apparent reason, and he never did.  So I ended up getting my paperwork

23  back and asking the other Troy to do it for me."  Id., at 48: 3-8.  Other than that, the only thing

24  petitioner could recall about this Troy was that he worked in the law library.  Id., at 48-49.

25           On cross-examination, petitioner states that he thinks he first met Troy Rhodes in

26  2004 or 2005, noting that they were housed in the same building.  SEHT, at 56-57.  This timeline

23

is somewhat earlier than that provided by Inmate Rhodes (late 2005, early 2006).  Petitioner also testifies that first person he gave his "stuff" to began to work but then gave the material back after which petitioner was told by someone about Troy Rhodes.  Id., at 58.  Although petitioner appeared somewhat confused in his testimony, he also contradicts Troy Rhodes' recollection inasmuch as he asserts that Rhodes prepared the November 2004, California State Supreme Court petition.  Id., at 58-59 & Resp. Ex. E.

On direct, petitioner testified that a prisoner could not have a PIA (Prison Industries) job, evidently virtually the only means of earning money in prison, "unless you have a reading – a high reading grade average... ."   SEHT 49:15-25, 50:1-10, 23-25.   Petitioner explained that prisoners do not get paid for going to school and "vaguely" recalled taking the first test at San Quentin in 1992 without help.  51:3-25, 52:1-9.  Petitioner recalls telling himself that he had received a high school diploma in 1990 so he "didn't think... – too much of it."  Id., at 52:3-5.  However, when it came to tests in 1997 and 1999, when as his counsel pointed out, petitioner "did a lot better," petitioner recalled asking for help with those tests because "school wasn't the place to be," as it would mean being taken from the PIA.  Id., at 52:10-22.  Petitioner testified that it was having the answers to a test signed to him by another inmate which "got me a 9.6, yes, it did.  It got me out of school."  Id., at 52: 23-25, 53:1-18.

During cross, however, with respect to the 1992 test as well as any other, petitioner testified that he "cheated on all of them."

Q.  Every single TABE test you took you cheated?

A.  I wasn't going to school for nobody.

Q.  Okay.

A.  Because I know that I want to survive.  You can't survive in prison in school.  You need soap, food, you need things.  You can't get that in school.

Q.  Did you cheat the same way every time on those TABE tests?

A.  Sure.  Or get the answers, already had the answers.

24

1   SEHT 63:7-23.

2           Petitioner goes on to say that while he attended classes, which he characterized as

3   "special ed," from the ninth to the twelfth grade, he cheated on his high school competency

4   [equivalency] test as well.  SEHT 64: 20-25, 65: 1-25, 66: 1-5.[15]  On re-direct, petitioner testified

5   that he received a GED, rather than a high school diploma and explained the way he used a cheat

6   sheet placed between his legs at Karl Holton (CYA) to pass a test.  Id., at 67:14-25, 68.

7                           *Testimony of Dr. Miller and Dr. Hamad*

8           Dr. Miller estimated that he had begun working for the California Department of

9   Corrections [and Rehabilitation] (CDCR) as of "March of 2000 as a forensic psychologist with

10  the mentally disordered offender unit, the forensic services division," continuing through to the

11  present day.  SEHT 79:1-5.  Dr. Miller explained to the court that he has served primarily two

12  functions: as a half-time prison staff psychologist and subsequently as a member of the Northern

13  California team of forensic psychologists out of the MDO unit, each psychologist being tasked

14  with conducting evaluations and writing a report, under the Mentally Disordered Offenders Act,

15  of inmates up for parole, by interviewing the inmate, and reviewing his central and mental health

16  files and his unit health record.[16]  Id., at 81: 4-23.  Dr. Miller testified that, since his last

17  testimony in 2007, he had met with petitioner on April 5th  [2012] at Mule Creek State Prison

18  "for about four or five hours."   SEHT 73:7-17, 77:3-4.  Dr. Miller confirmed that petitioner had

19

20           [15] At this point, petitioner was adamant about having cheated on every test that confronted
     him: "[Y]ou get answers, the same way people cheat on taxes and cheat on their mid-terms, you
21   got people willing to help you get out of school.  And I – to be honest with you, I cheated.  I
     cheated.  I'm telling you, I cheated."  SEHT 64:4-8.  "Each test that I took, I cheated on.
22   Ashamed to say it.  I feel embarrassed saying it, but to be honest, yeah, I cheated.  I don't feel
     good about it, but yes."  Id., at 64:20-22,
23

24           [16] Dr. Miller elaborated on the procedure should he find that the inmate did not have a
     severe mental illness, which would require no further evaluation and the procedure should his
25   opinion be that he does, in which case an automatic second opinion is triggered and, if there is
     disagreement between the two evaluators then two additional evaluators are sent from the Board
26   of Parole Hearings.  Should either find that the inmate suffers from a mental illness indicating
     that he might be violent, then additional treatment would be a condition of parole.  SEHT 81-83.

both mental health issues and intellectual or cognitive disabilities and testified that petitioner's

mental health issues "gets in the way considerably" of his limitations cognitively.  Id., at 75:18-

21, 76:7-13.  Dr. Miller avowed his review of petitioner's 2007 mental health records showed

that his mental health during that period waxed and waned.  Id., at 76:22-25, 77:1-3.  Dr. Miller

testified that like other people similarly challenged, petitioner's mental health condition waxes

and wanes considerably.  Id., at 77:6-7.  He testified that his cognitive limitations "would stay

essentially the same as long as he's on his medication.  Id., at 77:8-15.

Based on his training, education and experience in California's prison system, Dr.

Miller opined that petitioner would not want to "exhibit vulnerability" in the form of appearing

to be "weak in any way" (including intellectually or cognitively) which would mark him as "easy

to prey on" or "an easy target."  SEHT 79:6-19.  He also confirmed that petitioner had well-

documented history of paranoia, compounding his fears, which "waxes and wanes." Id., at 80,

79:20-25, 80:1.  When asked on direct about petitioner's "288 priors," Dr. Miller opined that

petitioner's fear about that information getting out to the general population that would not

constitute paranoia but would be a legitimate "reality based fear" which could be exacerbated by

by paranoia.[17]  Id., at 80, 83-84.

Dr. Miller testified that petitioner had had a difficult time in college; he was

unable to understand the concept of one class having different sections offered at different times

and could not figure out the class schedule in order to attend class.  SEHT, 85-86.  Petitioner was

enrolled in three classes, one of which he dropped and the other two he failed; petitioner found

the college very difficult and unlike special ed.  Id., at 86.  In reviewing petitioner's high school

transcripts, when asked by the court if by looking at the transcript he could discern whether or

not a course was special ed or not, it appeared that he primarily relied on which courses petitioner

told him were special education classes rather than on some objective criteria, although he did

---

[17] Dr. Miller stated that he knew of instances where inmates had literally eaten their paperwork to avoid disclosure of such information.  Id., at 84.

say the number of credits for example, the ninth grade, were significantly inflated from which he

inferred petitioner was taking special ed classes.  Id., at 88-90 & Resp. Ex. A.  He also, on cross,

asserted that beyond information gleaned from petitioner on the subject, he relied on his own

observations.  Id., at 141-142.  Significant, however, for the court's assessment is also Dr.

Hamad's[18] testimony that at the time petitioner was in YA, there was no special education and

the only diplomas offered were regular high school diplomas or GEDs.  Id., at 187.  Moreover,

she testified that while CDC will accommodate special ed students under certain conditions, a

special education program is not provided.  Id.  She also maintained that petitioner's transcript

does not indicate special education was involved, finding that the subject requirements on his

transcript are no "different from what's required for a regular high school diploma in California."

Id., at 190:18-22, 191.  Her explanation for the high number of units (20) in a semester for a class

(social personal study skills) did not indicate it was a special ed class, but rather was explained

by the fact that:

> he was going to school seven hours a day in a confined live-in
> institution and he's not taking anything else; PE, woodshop, and
> he's getting oriented to going to school.  That seems to me a –
> probably a pretty intelligent strategy on the part of the
> administration to try to get these guys focused on starting school.

SEHT 192: 7-15.

Dr. Hamad confirmed that petitioner had received his high school diploma on

November 3, 1989, at Karl Holton School, and re-asserted that there was no special education

offered at the time at that school.  SEHT 194:10-20.

---

[18] Dr. Hamad, currently vice/principal with first line supervisory duties of the adult school at CSP- Sacramento, testified to working for CDC since 1994 and in the prison system as a contract college teacher since 1986.  SEHT 167:12-25.  In her present capacity, she testified to supervising academic teachers, vocational instructors, operating and supervising three full service law libraries, four TV stations and a media center, as well as to doing testing.  Id., at 167:25, 168:1-3.  Dr. Hamad also testified to having been a classroom teacher at Folsom State Prison during which time she administered the TABE, which she described as being the testing system by which the CDC[R] evaluates adult inmates coming into the prison system for school placement as well as a tool to evaluate inmate progress.  Id., at 169.

1    The ninth grade transcript, through Dr. Miller's testimony, shows petitioner

2 earned C's & D's in the academic subjects, e,g, he interpreted general math with a D10 under the

3 second semester as ten units earned in that class with a grade of D.  SEHT at 90-91 & Resp. Ex.

4 A.  Dr. Miller presumed that the tenth grade English class likely involved writing as well as

5 possibly the Social Studies class, while the 11th grade reading lab indicated to him that petitioner

6 needed extra help in reading.  Id., at 91:12-17.[19]

7    Dr. Hamad noted that in the eleventh grade petitioner received a B in the first

8 segment of his reading lab and attained an outstanding for six and one-half [of the 11 and one-

9 half] units of that lab.  SEHT 193:1-4 & Resp. Ex. A, p. 5.   She also observed that in the twelfth

10 grade he passed his first unit of English and received an A for 17 [of the 18] units in that class.

11 Id., at 193:5-10.

12    The high school record transcript also indicates that petitioner passed, on April 28,

13 1989, a high school competency test in each of three areas: reading, mathematics and written

14 expression.  See Ex. A.  When asked to explain this by the undersigned, Dr. Miller testified that

15 it was consistent with petitioner having testified that he had cheated on the tests.  SEHT, at 92-

16 93.  Dr. Miller also testified that based on totality of the information that he had, including the

17 records, petitioner's direct communication with him, the testing he had done and the testing by

18 one of the competency evaluators, petitioner "would have had to have had help" to pass the GED.

19 Id., at 93:18-20, 94:1-9.

20    Dr. Miller testified with respect to the TABE[20] tests that he "had never seen the

21 tests of adult basic education ever used in any setting other than the California correctional

22 setting" and found there to be a dearth of information about it, although he had found some

23

24    [19] The tenth grade transcript indicates that petitioner earned, inter alia, one unit of for
English with a grade of C in his second semester, three units with a C in the first semester of
Social Studies and one unit earning an A in the second semester for a total of four units for that
25 class.  See Resp. Ex. A.

26    [20] Tests of Adult Basic Education.

uncomplimentary information about it.  SEHT 94:13-20.   Referring to petitioner's Ex. 5, which

in part contains a copy of a journal article or review from the <u>Journal of Counseling Psychology</u>,

Vol. 16(3), pub. May 1969, pp. 281-282, evidently authored in 1968.   Dr. Miller testified that the

author of the article indicated that the "test instrument" had been "published without reliability

coefficients," something unheard of in psychology field; the author made "a kind of sarcastic

comment about a new form of validity "inherited validity," meaning that the validity rested on:

> an amalgamation of another test, selected items from the California
> Achievement Test, and to develop the TABE tests, they took some
> items from that, eliminated the items that were referring to childish
> content, and then claimed that the reliability for new test, which
> was changed in several ways, could be claimed as having the same
> reliability as the test it was derived from, which is patently
> ridiculous.

SEHT 97:8-23.

Dr. Miller asserted that the article spoke "to the professionalism of the test

developers..." and stated that he would in light of the article avoid the test "at all costs" because

its reliability is "compromised."  SEHT 98:9-15.   Dr. Miller acknowledged subsequent revisions

of the TABE after the article's publication, but questioned its value with respect to the tests taken

by petitioner because the records are unclear as to whether petitioner was taking the battery of

test from 1992 to 1997 or whether he had the shortened version and what the results were as

expressed in percentile.  <u>Id</u>., at 98-99.   He contends that the value of the test is "confusing,"

quoting the TABE manual itself, also contained in petitioner's Ex. 5, referencing a grade of 7.1:

"'[i]t does not necessarily mean that the examinee who attained that score can do 7th grade

work.'"  <u>Id</u>., at 99:16-29.   His later testimony is a bit more clarifying:

> Somebody who's a Level M, with the – that Level is meant to test
> in the range of 3.6 to 6.9.  If a person taking that Level M gets a
> grade equivalent result beyond that range, like a grade equivalent
> result beyond that range, like a grade equivalent of 7.1 –  remember
> the range only goes up to 6.9 – it indicates how a student at grade
> 7.1 would be performing on a test meant for 4th or 5th grade
> students.  That's a quote from the manual.  It goes on to say, "It
> does not necessarily mean that the examinee who obtained that
> score can do 7th grade work."

29

1    Id., at 125: 20-25, 126:1-3.[21]

2              Dr. Miller went on to explain that the TABE itesting only within the population

3    referenced and is not "normed on a normal population."   SEHT 126.  Dr. Miller confirmed that

4    petitioner in these tests is being compared to a special ed class.  Id.  Dr. Hamad, at least

5    implicitly, contradicted Dr. Miller, in testifying that it was her understanding that percentile

6    scores on that test constituted a norm for the test not just limited to CDC but used publically in

7    adult basic education.  Id., at 182.

8              Dr. Miller also compares the TABE group testing (although he characterized it as

9    an "advantage" in terms of being "inexpensive" and "quick") unfavorably with the one-on-one

10   tests he administered to petitioner in a standardized procedure within three feet of him, testifying

11   that petitioner did not cheat in his tests.  SEHT 100- 101.

12             Referencing page 1 of petitioner's Ex. 5, Dr. Miller described the several levels of

13   the TABE test:

14             The lowest level is called L for Literacy, and grade range [is] from
               0 to 1.9.  The test level E, E for easy, offers content from the 1.6 to
15             3.9 level, and the 1.6 means first grade sixth month.  So you've
               been in school for the first grade and six months counting from
16             September, so October is 6.1, November is 6.2, so it works li[k]e
               that.

17
               Medium, M, the test level medium is 3.6 to 6.9, D for difficult 6.6.
18             to 8.9, and A for advanced 8.6 to 14. 9.

19   SEHT 101:12-18.

20   _____

21        [21]   The manual excerpt states: "Caution should be exercised not to misinterpret GE [grade
     equivalent] scores.  For example, the Level M Mathematics Computation test measures
22   performance on content that is typically taught in fourth and fifth grade.  However, because of the
     scaling techniques used for TABE, Level M may yield a GE beyond that grade range.  A GE of
23   7.1 on the Level M Mathematics Computation test indicates how a student at Grade 7.1 is
     performing on a test meant for fourth and fifth grade students.  It does not necessarily mean that
24   the examinee who obtained that score can do seventh grade work.  On the other hand, the Level
     D test covers the content that is typically covered in grades 6 though 8.  A GE of 7.1 on the Level
25   D test shows that the examinee is performing like a seventh grade student on material appropriate
     for the seventh grade."  Ptnr's Ex. 5, Part 7.9.  This excerpt was also read by Dr. Hamad during
26   her cross-examination at petitioner's counsel's request.  SEHT:1-14.

Dr. Hamad further explained that if someone were testing at the M level, which constituted the level that petitioner was tested on all tests, and tested beyond the parameters of that test, that is, beyond the age or grade level range for that level of the test, a student should be retested at a D or an A level.  SEHT 174, 209:17-20.

Dr. Hamad described the protocol for administering the TABE; she testified that preliminarily, a day or two or a week before the test she would discuss the test to make sure the students knew they were to be tested and how they should prepare in order to do their best; she also described having a seating chart for test day to make sure no two students sitting next to each other were taking the same version or same level of a test.  SEHT 170:5-15.

> When they are taking the test, all of their personal items have to be somewhere else outside of reach, outside of access, and the test is actually timed, and so you put the subject and the amount  – the starting time and the ending time on the board where they can view the clock so that they can see how much time they have left.  I usually would warn the students when they were getting toward the end of a section, and you proctor the test the whole time.  You walk around, you observe the students from various viewpoints, and there is absolute silence.  If there is talking or communication, those tests are ended.  If there's any disruption in the class, the test is stopped and it will be rescheduled for another time.

Dr. Hamad's testimony at SEHT 170:16-25, 171:1-2.

In describing cognitive skills of the population as a pyramid, Dr. Miller began at the base of an imaginary pyramid with the abilities at the bottom being able to pay attention or to receive sensory information, the next level including the lower levels and "increasingly complex cognitive skills," until "at the top of the pyramid, you would find the ability to problem solve and do abstract thinking."  SEHT 127.  Dr. Miller broke down the entire population into thirds, explaining that only a third of U.S. adults even "have the ability to do abstract thinking;" another third "are in transition... halfway between concrete and abstract, and a third are just concrete thinkers," concrete thinkers being those who would interpret literally a saying such as those who live in glass houses should not throw stones, i.e., because"the glass'll break, dude," while abstract thinkers would generalize beyond that to finding the expression to be a caution against

1    hypocrisy or an admonition not criticize others when one has his own faults.  Id., at 128:1-13.

2            Dr. Miller reminded the court that his prior testing had shown frontal lobe damage

3    "neurological deficits" in petitioner, the third of the brain responsible for executive functions,

4    such as organizing, prioritizing, planning, sequencing.  SEHT 128-129.  Dr. Miller described

5    seeing about one in ten prisoners with the capacity to think abstractly, but was not sure that Troy

6    Rhodes fit into the top third of his pyramid.  Id., at 129:12-25.  While he stated that Mr. Rhodes

7    was "clearly...in a different league of cognitive ability" from petitioner, he was not "totally

8    convinced" that he had the ability to think abstractly.  Id.   At this point, the undersigned had an

9    inquiry:

10               The Court: But on this pyramid and what you said only in the top
                 third, and perhaps since we're dealing with prison[,] we'll say the
11               top third to the top quarter[,] can be expected to have the mental
                 wherewithal to file a habeas petition; that was your testimony?
12
                 The Witness: Yes, to do the whole thing.  To understand and grasp
13               the whole thing, to track it, to figure out the sequence, to sort out
                 what's important, what do I do next, to seek out the resources in a
14               timely fashion, to anticipate consequences; if I don't do this, then
                 that will happen.  It's the - - in cognitive psychology they call it "as
15               if" thinking.  If you can do hypothetical thinking, if I do this, what
                 will happen without having to concretely manipulate objects.  You
16               can do the operation in your head, mentally.

17   SEHT 130:1-14.

18            The court finds such an evaluation to be unrealistically rigid vis-a-vis both Mr.

19   Rhodes and the expectations for the filing a habeas petition by a prisoner.  With such a model,

20   granting equitable tolling would, indeed, find the exception swallowing the rule against such.

21            Dr. Miller conceded that some of the TABE test scores and other documentation

22   in this supplementary hearing had shown him "some new things" about petitioner's "Axis II

23   pathology, his antisocial personality characteristics" that he "does have some ability to have

24   manipulated the environment in such a way that he got his needs met," i.e., that he found a way –

25   by cheating – to get out of going to school and to get a paid job.  SEHT 131:1-16.  But Dr. Miller

26   adamantly sought to distinguish this level of intelligence from that required to file a habeas,

32

1   describing a former client who possessed the skills to run a business and other indicia of success,

2   but who was unable to read because his brain had been deprived of oxygen during a near

3   drowning incident.  SEHT 131-132.  In other words, Dr. Miller explains that one could function

4   as petitioner has in a number of jobs (Prison Industries, porter, painter, kitchen, sewing machine

5   operator – petitioner's testimony-SEHT 68) without having the requisite skills for writing/filing a

6   habeas.

7           Dr. Hamad also testified that it was her experience that the staff is very careful in

8   monitoring tests to make sure inmates do not cheat and that cheating means an inmate has been

9   tested with the wrong materials and is a waste of time; she also testified that in her experience

10  that cheat sheets prepared to sell to others have most of the answers wrong.  SEHT 176:6-14.

11  When, on direct, respondent's counsel asked Dr. Hamad if, based on her experience with the

12  TABE test, whether petitioner's testimony as to how he cheated on them was realistic, she

13  responded:

14           A.  You mean with the hand signals?

15           Q.  Yes.

16           A.  I think he would be caught in a minute.

17  SEHT 193: 19-21.

18           When asked if she had ever seen anyone cheat that way, she stated:

19           I've never seen anyone do it that way.  Usually they have a piece of
             paper to write down, like he was saying, with that little folded
20           piece of paper.  I've seen that.  A lot of times they'll try to write it
             on their arm or something so they can pull up their sleeve.  But
21           their strategies aren't real sophisticated and then oftentimes when
             we –  if we find one of those and then compare it to the correct
22           answers, we find that it wouldn't really have helped much anyway,
             but they get a write up for it and that can have some consequences
23           on what their options are.

24  SEHT 193:22-25, 194:1-9.

25           Dr. Hamad described the different tests administered to petitioner.   Respondent's

26  Ex. T, a 1992 TABE chrono, she characterized as a full battery of the survey test done at a

1   reception center, which would only take an hour to administer combined with psychological tests

2   not performed by education staff and without the name of an examiner which is unlike current

3   procedure.  Id., at 177:1-12.  In the TABE portion, the grade level for "reading: (vocabulary &

4   comprehension)" it lists petitioner at a 5.7 grade level; "mathematics: (computation &

5   expression)" shows a 4.7 grade level for petitioner as does the results of the "language:

6   (mechanics and expression)," with an "overall academic - grade level" of 5.7.  Respondent's Ex.

7   T.  Dr. Hamad characterized this testing as a quick assessment of basic academic skills,

8   confirming that the test questions in each area were tested for about twenty minutes.  Id., at

9   177:24-25, 178:1-8.

10          As to the May 1994 TABE test, Dr. Hamad testified to its being an "M level test"

11   with the "grade equivalents" being "4.6 reading, 7.2 math, 3.7 language, and 5.2 for the total

12   battery."  SEHT 180:4-11 & Resp. Ex. A, p. 10.  She explained further that this test was a survey

13   or short version "administered by Carolyn Gueffroy, which means it was a very, very well

14   proctored exam..." with "the full report" provided to the teacher "for use in the classroom to talk

15   to the student about his test results and plan his academic program."

16          On petitioner's January 3, 1995 TABE M level test (SEHT 183:21-25), Dr.

17   Hamad stated:

18              He has 5.6 reading, so he went up in reading, 6.3 math, so he went
                down in math, 4.7 in language, he went up in language, and a 5.50
19              overall, so he went slightly up in his overall score.

20   Id., at 2-5, Resp. Ex. A, p. 9.

21          An education progress report chrono, dated March 31, 1995, signed by and

22   instructor named J. Porter, references the 1/03/95 TABE test results and notes with respect to his

23   assignments: "[h]e has completed all written work with at least 80% correct and all computer

24   work with at least 90% correct.  He has completed 7 reading levels in the TRO computer

25   program and has gained an average of 6 grade level points in the 2 months of his assignment.

26   Bills has made an improvement in both written and computer work."  Resp. Ex. A, p. 11.  Dr.

1    Hamad referred to this document "as basically a report card" given out quarterly.  SEHT 196:5-6.

2    The 128E education progress report shows petitioner to be, according to Dr. Hamad,

3    "a committed student" who "likes working" and that he is working in ABE II level materials and

4    that he completed 17 units in the quarter from September through December of 1994.  Id., at 196:

5    10-18 & Resp. Ex. A, p. 11.

6            Petitioner's April 19, 1995, TABE detailed test results are found at respondent's

7    Ex. A, p. 8.  On this test, petitioner's total reading score was 6.9, his total math score was 7.4, his

8    total language was 4.8 and his total battery was 6.5.  Id. & SEHT 182: 13-14, 20-21.  Dr. Hamad

9    observed an improvement (though only slight with language) from the test given a few months

10   earlier; she also noted that under "vocabulary" it was indicated that he got nine out of 11 test

11   questions having to do with synonyms correct, with "mastery" indicated by a plus sign indicating

12   his readiness to move on to the next level while he needs some work with "affixes," i.e., prefixes

13   and suffixes, because he got only half of those right (two out of four).  SEHT 183 & resp. Ex. A,

14   p. 8.[22]

15           In the TABE test taken on October 28, 1997 at CSP-Sacramento, petitioner scored

16   9.6 on reading, 6.3 in math, 5.4 in language and 6.7 total on a test that was M level 7, "a full

17   battery, full length test," according to Dr. Hamad, a full length test being a four-hour test.  SEHT

18   172:13-18, 176:6-8, 187:21-25, 188:1-2, 189:11-12 & resp. Ex. A, p. 7.  At this point Dr. Hamad

19   stated that she knew Mr. Grady, the teacher who administered the test, had supervised him until

20

21           [22] The court has observed that on this test, petitioner showed some weakness with, for
     example, pronouns I, nouns and adjectives (an area in which Dr. Hamad indicated petitioner
22   consistently did not do well–SEHT 184) under language mechanics (one out of four correct), but
     mastery with five out of five for period, question [mark] exclamation point and in reading
23   comprehension, he showed mastery in each the components with perfect scores (10 out of 10) in
     interpreting events and (four out of four) in writing techniques.  Resp. Ex. A, p. 8.  Dr. Hamad
24   had grouped his performance with question marks and exclamation points into areas in which he
     did not do well, however, while she was right that he did not do well with proofreading (two out
25   of six), it appears that it was commas, colons and quotation marks on which he was weak (four
     out of ten right), rather than with question marks and exclamation points.  See SEHT 184 & resp.
26   Ex. A, p. 8.

1  his retirement, had been in his classroom when he gave TABE tests and knew "that cheating is

2  not an option. . . particularly the kind of clumsy cheating Mr. Bills was trying to pawn off on us

3  during his testimony."  SEHT 188:3-4, 16-22.

4       The TABE test taken by petitioner on March 1, 1999, was an M 7 (Medium level

5  7) at Mule Creek State Prison, a different prison from where the 1997 test was taken, with Dr.

6  Hamad noting that petitioner at that point was "in the same situation he was when he came to

7  Sac.  He wants to get out of education so he can get a job.  He needs that 9.0 reading, and he

8  did."  SEHT 189:7-12, 16-18.  His scores on this test were "9.9 reading, 6.9 math, 3.2 language,

9  and 8.6 overall."  Id., at 189:20 &  Resp. Ex. A, p. 6.  When asked on cross, Dr. Miller identified

10  respondent's Ex. A, [p. 12], as a document indicating that petitioner refused to test on March 25,

11  2010 [during the pendency of proceedings related to equitable tolling].  Id., 137:6-23.

12            *Discussion*

13       In light of the evidence presented in two evidentiary hearings and the totality of

14  the evidence presented to this court, the undersigned is simply unable to conclude that petitioner

15  meets the first portion of the first prong of the standard set forth by the Ninth Circuit, that is, it

16  does not appear to this court, petitioner's neurological deficits and antisocial personality disorder

17  notwithstanding, that petitioner was not able rationally or factually to understand the need to

18  timely file.  Focusing around the period for which petitioner believes equitable tolling is

19  warranted, from October 12, 2005, until the filing of the instant petition on October 10, 2006,

20  there is sufficient evidence that petitioner's cognitive function remained primarily within normal

21  limits.   As noted by respondent in the post-remand briefing, on September 20, 2005, Dr. P.

22  Morgan found petitioner's attention, concentration, memory and thought content and quality to

23  be within normal limits and, with regard to his thought content and quality, found that it was both

24  "focused" and "organized."  Resp. post-remand brief (docket # 59), p. 12, citing Ex. G, p. 27,

25  from first evidentiary hearing (FEH) and Ex. G from SEHT, as well.  While the court does note

26  that the interdisciplinary mental health progress note does indicate that petitioner had "poor"

1  judgment and insight, it is also true that it was noted that petitioner denied hallucinations,

2  delusions, suicidal and homicidal [ideation].  Id.

3             On October 11, 2005, while Dr. Morgan noted that petitioner was "restless,"

4  "agitated," and that his insight and judgment were "poor," it was also found that petitioner's fund

5  of information, intellectual functions, organization of thought, association of thought, reality

6  contact and thought quality were all within normal limits.  See docket # 59, p. 12, Ex. G, p. 29,

7  FEH.  Respondent points out that Dr. Morgan noted the following: "I/M tried to set the stage that

8  115's he received are not his fault – that his mental health condition is not being taken into

9  consideration."  Id.  Also noted, is petitioner's Axis I Bipolar disorder NOS, Schizophrenia, his

10  Axis II Antisocial personality disorder, history of femur problems, his no. 1. problem/symptom

11  listed as "anger."  Id., Ex. G, p. 30 FEH.  Further noted is petitioner's "excessive energy" and his

12  "poor insight" and "unwillingness to see his part in the difficulties that he has."   Id.

13             On October 23, 2005, Dr. Sharma noted in his evaluation that petitioner showed a

14  good response to his medication; was alert and cooperative; exhibited speech, flow of ideas,

15  mood affect and cognitive functions all within normal limits; had no delusions, obsessions,

16  paranoid ideas or hallucinations; and found his mood "stable."  Docket # 59, p. 12, Ex. G at 32

17  FEH.   On December 19, 2005, Dr. Sharma reported essentially the same findings.  Id., Ex. G at

18  33.  With his briefing, petitioner supplemented Ex. G (from the first evidentiary hearing), with

19  additional medical records for the relevant period.  On March 11, 2006, the psychiatrist Dr.

20  Sharma again found petitioner to have a good response to medication, to show alertness, to have

21  speech and flow ideas, cognitive functions, mood and affect all within normal limits, with no

22  delusions, obsessions, paranoid ideas or hallucinations, no homicidal ideas, and suicidal

23  ideas/intent denied.  Docket # 59-1, p. 1.  A "steady improvement" is assessed and a "positive"

24  attitude noted.  Dr. Sharma makes virtually the same evaluation on May 6, 2006, and on August

25  3, 2006.  Id., at 2, 4.  Interdisciplinary progress notes evidently authored by petitioner's staff case

26  manager indicate that on June 16, 2006, petitioner presented as alert, with mood, affect, speech

all within normal limits and cognition "intact."  Id., at 3.  On August 16, 2006, it is noted in

petitioner's progress notes that, inter alia, his mood/affect, cognition, thought content, insight and

judgment were all within normal limits.  Id., at 5.  On September 19, 2006, it was noted that

petitioner was "upset," "agitated," "animated," and "hyper-verbal," but his cognition was noted

to be within normal limits and no hallucinations, delusions, suicidality or current violence risk

were reported.  Id., at 7.  On November 2, 2006, Dr. Sharma again noted petitioner's response to

and compliance with medication to be good, his alertness and cooperative attitude his speech and

flow ideas, cognitive functions, mood and affect all within normal limits, with no delusions,

obsessions, paranoid ideas or hallucinations, no homicidal ideas, and suicidal ideas/intent denied.

 Id., at 8.

Not much referenced at the hearing is the evidence of the prior federal petition

petitioner filed in the Northern District with respect to the § 288 conviction.  Respondent's Ex. I

contains a copy of petitioner's pro se federal habeas petition, stamped as filed on June 27, 2000,

in the Northern District, regarding petitioner's 1994 conviction for, inter alia, lewd and lascivious

conduct with a child (Cal. Pen. Code § 288(a)).  See Bills v. Pliler, No. C-00-2275 THE (N.D.

Cal. 2000).[23]  There does not appear to have been any issue with regard to timeliness of the

petition as the petition was adjudicated on the merits.[24]  Resp. Ex. I, Order Denying Petition for

Writ of Habeas Corpus, in Case No. C-00-2275 THE, docketed on November 30, 2001.  A

review of the docket of that case, of which docket this court takes judicial notice, is instructive.

---

[23] In a declaration appended to the petition, signed by petitioner and dated June 11, 2000, petitioner states that he is an unskilled layman with regard to the law and has "only a grade level of 11th education," by which petitioner apparently intends to say that his education level is that of an 11th grader.

[24] Although petitioner's 1994 conviction pre-dated the April 24, 1996 enactment of the Anti-Terrorism and Effective Death Penalty Act, it is apparent that the AEDPA statute of limitations would have applied to a federal petition filed in the year 2000.  That is, AEDPA's one-year limitation (28 U.S.C. § 2254(d)) would not have applied had the federal  petition been pending when the AEDPA went into effect, Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059, 2061 (1997), but the petition was not filed until four years later such that AEDPA's provisions unquestionably applied.

1 It is unclear whether or not petitioner prepared and filed the Northern District petition or the

2 multiple motions, letters and declarations filed on petitioner's behalf in that case.  What does

3 emerge, however, as virtually indisputable is that petitioner had some understanding of the time

4 constraints on filing the petition and, at a minimum, was able to find someone to file the petition

5 timely for him.  There simply was not evidence presented to show petitioner's mental condition

6 to have been significantly distinguishable during the period when he was able to timely file a

7 federal habeas petition under the statute from the instant case when he was not.

8           Applying the standard disjunctively, as instructed by the appellate court, as well as

9 very broadly, at most the court could find petitioner's mental state to have rendered him unable

10 personally to prepare a habeas petition within the relevant period; however, the court simply

11 cannot find under these circumstances that petitioner showed diligence in pursuing the claims to

12 the extent he could understand them, but for his mental impairment having rendered it impossible

13 to meet the filing deadline under the totality of the circumstances, including the question of

14 reasonably available access to assistance.  There is some confusion as to whether another Troy

15 actually existed.  Although the court, frankly, found Troy Rhodes to be more credible in his

16 testimony than petitioner, and Mr. Rhodes was fairly sure that he did not file the state court

17 petition but that another Troy did, petitioner ultimately represented that Mr. Rhodes had also

18 prepared the state Supreme Court petition.  To the extent that he also hints that the other Troy

19 hindered him from obtaining the records back for him to provide to Troy Rhodes to prepare his

20 federal petition and/or that the mystery Troy was attempting to extort him or threaten him with

21 exposure feels more like an effort to fit within the parameters set forth by the Ninth Circuit with

22 regard to the question of availability of assistance to petitioner than any circumstance for which

23 adequate evidence was presented.[25]  In any event, petitioner did not testify to having been turned

24 down by a multitude of jailhouse lawyers.  Indeed, when he asked for assistance from Troy

25

26      [25]After all, the conviction at issue here involves possessing a sharp instrument in prison,
*not* a sex crime.

1    Rhodes, he got it immediately.  The point here is that he knew how to get that assistance and

2    knew what he wanted accomplished – the filing of a federal habeas petition.

3              With respect to the efficacy and administration of the TABE, the court found Dr.

4    Hamad's hands-on as well as supervisory experience to be elucidating.  Her testimony

5    significantly undermined petitioner's testimony as to his claim of rampant cheating on these tests,

6    which testimony was itself inconsistent, inasmuch as he stated that he had cheated on all but the

7    1992 test which he revised when he later insisted he had cheated on all of them.  Petitioner's

8    mission with regard to the TABE testing appeared to be confused.  On the one hand, petitioner's

9    expert accepted that petitioner had cheated his way through the TABE tests and possessed the

10   type of skill of manipulation in order to do so.  What this testimony shows, even if accepted,[26] is

11   that petitioner could understand the importance of not appearing to perform so badly that it might

12   make him unable to obtain a job or appear vulnerable.  It is precisely this type of understanding

13   that petitioner would bring to the concept of needing to file a habeas petition to extricate himself

14   from his present predicament.  The fact that petitioner might not have been aware of the specific

15   AEDPA deadlines is not the point – the point is he possessed the overall mental wherewithal to

16   understand that he did not have forever to file the petition if the petition was to do him any good.

17   The evidence shows that he undertook the measures necessary to get the job done, albeit too late.

18             As noted, it appeared to the court that Dr. Miller's pyramid of concrete to abstract

19   thinking if applied to the prison population would result in equitable tolling being warranted to,

20   at a minimum, at least one-third of the entire population and even more as he indicated that the

21   proportion of abstract-capable thinkers in prison was even less than that of the total population.

22   His hesitation about how and where Troy Rhodes fit within the pyramid, an individual who

23   convincingly presented himself to the court as an experienced jailhouse lawyer with decent grasp

24   

25             [26]  Contrary to the usual situation where a person has an excuse for every time he did
     poorly, petitioner had an excuse attempting to explain away every time he exhibited good or
26   adequate performance.  This smacks of being a bit too convenient given the issues here.

1   of both the issue before the court and of habeas practice in general, certainly with regard to the

2   procedural issues of timeliness and exhaustion, made his assessment appear impractical.  In light

3   of such an assessment, Dr. Miller's testimony, with regard to his opinion as to petitioner's ability

4   to draw on skills arising from the top of the pyramid – "It's not that he doesn't try.  It's that he

5   can't do it.  It's not within his ability.  It's like asking somebody to fly" [SEHT165-66] – simply

6   does not appear to be a realistic one.  With due respect to Dr. Miller, even if the court accepts

7   that petitioner has significant mental health deficits, it is also quite clear that he has demonstrated

8   an ability to obtain what he wants or needs when he wants to, e.g. obtain a qualifying reading

9   score when a job was on the line.  His success at a variety of jobs, his test-taking ability when he

10  needs to meet a particular standard to obtain a job, his ability to file grievances,[27] his earlier

11  ability to file a timely federal habeas petition all militate for a finding that petitioner is able to

12  maneuver his way through the daunting labyrinth that is prison life is actually fairly impressive.

13  The totality of the evidence indicates that when petitioner is motivated, he can get what he

14  desires; when he is not, his attitude shows low performance.

15         Respondent also, in cross-examination of Dr. Miller, brought out the statement

16  contained in Dr. Foster's evaluation of November 30, 2001, wherein Dr. Foster had noted:

17  "Before beginning the interview, he had been in the legal library, where he said he was

18  researching information regarding his case."  SEHT 140 & resp. Ex. H, p. 3.  Even if one

19  concludes that petitioner was only seeking assistance in researching his case, this is precisely the

20  type of activity that makes an incompetency finding unwarranted under the standards posited by

21  the Ninth Circuit.  As to his apparent fear of having his record of a sexual offense with a minor

22  exposed, it is interesting that petitioner was able to file a petition actually regarding that

23  conviction without the problems that confronted him on this occasion.

24

25         [27] Petitioner managed to submit, whether written by him or copied by him, at least one
    602 inmate appeal dated September 11, 2005, close in time to the period at issue (from October
26  12, 2005 to October 10, 2006).  Respondent's Ex. C.

1    The court finds that petitioner has not met his burden to show entitlement to

2  equitable tolling.

3    Accordingly, IT IS ORDERED that petitioner's request for judicial notice, filed

4  on November 15, 2011 (docket # 76), is granted to the extent set forth above as to documents

5  within Exhibits C and E, and denied as to those documents at Exs. A, B and D.

6    IT IS HEREBY RECOMMENDED that respondent's motion to dismiss, filed on

7  March 27, 2007, be granted and this case be dismissed.

8    These findings and recommendations are submitted to the United States District

9  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **ten days**

10  after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13  shall be served and filed within ten days after service of the objections.  The parties are advised

14  that failure to file objections within the specified time may waive the right to appeal the District

15  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16  DATED: June 15, 2012

17        /s/ Gregory G. Hollows
        UNITED STATES MAGISTRATE JUDGE

18  GGH:009
    bill2223.fr

19

20

21

22

23

24

25

26